# United States Court of Appeals

## For the First Circuit

No. 09-2569

FIDEICOMISO DE LA TIERRA DEL CAÑO MARTIN PEÑA,

Plaintiff, Appellant,

v.

LUIS G. FORTUÑO, in his official capacity as Governor of the
Commonwealth of Puerto Rico; ANTONIO M. SAGARDÍA-DE JESÚS, in his
official capacity as Secretary of Justice of the Commonwealth of
Puerto Rico; MUNICIPALITY OF SAN JUAN; JORGE SANTINI in his
official capacity as the Mayor of the Municipality of San Juan;
AUTORIDAD DE ENERGÍA ELÉCTRICA; AUTORIDAD DE CARRETERAS; and
ADMINISTRACION DE TERRENOS,

Defendants, Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

Judith Berkan, with whom Mary Jo Méndez, Berkan/Méndez, Pedro
J. Saade, and the Clínica de Asistencia Legal Escuela de Derecho,
Universidad de Puerto Rico, were on brief for appellant.
Eliezer Aldarondo-Ortiz, with whom Eliezer A. Aldarondo-López,
Aldarondo & López Bras, Guillermo Somoza-Colombani, Attorney
General, Mercado & Soto Law Offices, Maymí, Rivera & Rotger,
P.S.C., Angel Rotger Sabat, and Francisco J. Amundaray were on
brief for appellees.

April 28, 2010

**LYNCH**, **Chief Judge**. Plaintiff, Fideicomiso de la Tierra del Caño Martin Peña (Land Trust of the Martin Peña Canal, hereinafter "Fideicomiso"), an entity created by legislation, brings an unusual Takings Clause claim. The Fideicomiso does not attack the exercise of government condemnation or eminent domain powers. Rather, the challenge is to Law 32, a legislative amendment to an earlier statute enacted in 2004. That earlier statute is Law 489, which the Fideicomiso correctly admits serves a number of public purposes and which created the Fideicomiso. Law 489 was implemented by, inter alia, transferring to the Fideicomiso title to certain lands that had originally belonged to public agencies of the Commonwealth of Puerto Rico and the Municipality of San Juan when Law 489 was enacted. Law 32 revoked the Fideicomiso's title to those lands and returned title to those Commonwealth and municipal public agencies.

The essence of the Fideicomiso's claim is that if it is stripped of title to these lands and public agencies are reinvested with title, those agencies cannot be trusted to carry out the public purposes embodied in Law 489. The Fideicomiso styles this as a claim that the transfer of lands back to public agencies does not meet the "public use" requirement of the Takings Clause.

We order dismissal of the complaint.

In 2004, Puerto Rico enacted Law 489, the Martin Peña Canal Special Planning District Integrated Development Act. See

-2-

P.R. Laws Ann. tit. 23, § 5031-5066. Law 489's stated public purpose is "to give priority attention to the environmental restoration of the Martin Peña Canal and to rehabilitate and revitalize the communities along its north and south banks" and to thereby "promote a healthy relationship between the natural environment and its surrounding city and communities, with a vision of integrated development based on community empowerment." Id. § 5032.

The more specific purposes of the Martin Peña Canal ENLACE (LIAISON) Project, as embodied in Law 489, include:

> *Environmental*. To enable the rehabilitation of the San Juan Bay Estuary, improve the quality of its waters and the habitat of its fauna and wildlife by broadening and dredging of the Martin Peña Canal and a conservation strip along both banks thereof.
>
> *Socio-economic*. To improve the living conditions of the approximately thirty thousand (30,000) residents of the eight communities located along both sides of the Canal in the areas of public sanitation, housing, ordinance and quality of the urban spaces and the infrastructure.

Id. These stated purposes make it clear that one of the explicit intentions of the Martin Peña ENLACE Project is to remove conditions harmful to the public. Another explicit intention of the project is "to foster an integrated community development spearheaded by the members of the communities themselves." Id.

To implement these policy goals, Law 489 created two entities, the Martin Peña ENLACE Project Corporation

-3-

("Corporation"), id. § 5033, and the Fideicomiso, id. § 5048. The Fideicomiso, as a land trust, was charged with administering and developing certain lands in the canal area for the benefit of the communities there. Id. One of its key goals was "[t]o contribute toward the solution of the ownership rights problem of many District residents through collective land-holding." Id.

The Corporation's mandate made it "responsible for coordinating the implementation of all aspects of the ENLACE Project; including . . . housing development, infrastructure, the dredging and canalization of the Canal, as well as urban and socio-economic development," and "[t]o guarantee mechanisms for citizen participation in the planning and execution of the ENLACE Project and promote community empowerment." See id. § 5033.

Toward those ends, Law 489 provided that title to any lands in the canal area owned by the Commonwealth of Puerto Rico and the Municipality of San Juan would automatically transfer to the Corporation 160 days after the act became effective. Id. § 5045.[1] The Corporation would then transfer these lands to the Fideicomiso after regulations governing the Fideicomiso's operations were established. Id. §§ 5046, 5048. Those regulations were promulgated on October 21, 2008. See General Regulations for

---

[1] There was an exception for a maritime terrestrial zone, id. § 5045. Further, the Department of Housing was directed to do title searches and, where appropriate, to provide registration of ownership rights to residents of the area within one year. Id. § 5047.

-4-

the Operation of the Caño Martín Peña Land Trust (hereinafter "Land Trust Regulations"). The land transfer to the Fideicomiso was completed with a formal deed on May 14, 2009, nearly five years after Law 489 was enacted.

One month later, on June 18, 2009, Puerto Rico enacted Law 32, a law which retroactively revoked only article 16 of Law 489, the article which had provided for the transfer of lands from the Commonwealth and Municipality to the Corporation and ultimately to the Fideicomiso. See Act of June 23, 2009, No. 32. Under Law 32, title to those lands was to revert back to the Commonwealth and Municipality immediately. Id. art. 1. Law 32's stated purpose was "[t]o amend Article 16 of Act No. 489 . . . to make viable that its provisions be harmonized with other laws, and to clarify that public domain lands are not transferrable." Id. pmbl. Most pertinent to this case are these provisions:

> Should the Corporation or the Fideicomiso, by virtue of the Act, have attempted to or have registered any Municipal property to its name, the same is by the present revoked and without effect and the title will immediately revert to the Municipality of San Juan.
>
> The properties of the Commonwealth of Puerto Rico will be studied and evaluated by its title holding dependencies to determine if these remain titled to the agency....
>
> Any of these properties which have been transferred to the Corporation or Fideicomiso will revert to the original Agency or Titleholder in order to follow the legal process previously mentioned.

-5-

Id. art 1.  The only lands the Corporation transferred to the Fideicomiso came from the public agencies of the Commonwealth and Municipality.  Accordingly, the provision as to the reversion to the original titleholder is inapplicable.  Law 32 does provide that public agencies may, under certain conditions, transfer title to lands in the canal district to the Corporation.  Id.

Two days after Law 32's enactment, the Fideicomiso brought a civil rights suit in the federal district court of Puerto Rico against various entities and officials of the Commonwealth and the Municipality.  The Fideicomiso primarily seeks to invalidate Law 32 under the Takings Clause, though it also makes claims under the Due Process Clause, the Contracts Clause, and the Ex Post Facto Clause of the United States Constitution.[2]  Implementation of Law 32 has been stayed by this court in order to maintain the status quo while the constitutional issues are addressed.

The Takings Clause of the Fifth Amendment applies to the states and to Puerto Rico through the Fourteenth Amendment.  See Tenoco Oil Co., Inc. v. Dep't of Consumer Affairs, 876 F.2d 1013, 1017 n.9 (1st Cir. 1989).  The Takings Clause sets two conditions on the government's constitutional authority to take private property: the government may take private property for "public

---

[2]     The Fideicomiso also challenges Law 32 under the parallel due process and takings clauses of the Puerto Rican constitution.

-6-

use," but it must provide just compensation when it does so.  U.S. Const. amend. V.

The Fideicomiso says that Puerto Rico lacks authority to retake title to property recently transferred to the Fideicomiso, and that the federal courts should enjoin defendants from implementing Law 32 to do so, because any taking would not be for "public use."[3]  It does not seek just compensation.

## I.  Facts

The events leading up to Law 32's enactment are undisputed.

For centuries, water from the San José Lagoon emptied into the ocean by way of the Martin Peña Canal, a shallow, narrow, three-mile-long channel surrounded by mangrove swamps that runs through the heart of the city of San Juan.

Until the mid-twentieth century, the area around the canal was unsettled and undeveloped.  The Great Depression hit Puerto Rico's agricultural economy especially hard, and Hurricanes San Felipe and San Ciprian, two of the worst in Puerto Rican

---

[3]  The district court did not reach the merits of this claim because it declined to exercise jurisdiction over the Fideicomiso's claims under the abstention doctrine of R.R. Comm'n of Tex. v. Pullman, 312 U.S. 496 (1941).  See Fideicomiso de la Tierra del Caño Martin Peña v. Fortuño, 670 F. Supp. 2d 132, 140-42 (D.P.R. 2009).  It reasoned that whether the Fideicomiso owned "private property" subject to the Takings Clause turned on difficult and unsettled questions of Puerto Rican law best left to the Puerto Rican courts.  Id. at 137-40.  Our approach is to ask questions preceding the ones on which that court focused.

history, destroyed agricultural production and left hundreds of thousands of people homeless. <u>See</u> Carlos Marquez, What If? Puerto Rico's Economy: It's a Matter of Status, P.R. Herald, Aug. 5, 2004. Migrants fled ravaged rural communities for San Juan, and there, lacking the resources for anything else, they began settling the swampland around the Martin Peña Canal.

Generations of Puerto Ricans have since migrated from the countryside to the city, and the canal area is now home to some 30,000 residents in eight distinct communities spanning hundreds of acres. <u>See</u> P.R. Laws Ann. tit. 23, § 5032. Residents have made the swampland habitable by sinking dirt, garbage, and debris into the swampland until it became firm enough to support the makeshift homes they built from salvaged wood and corrugated tin. There are no paved roads and few basic utilities. Sewage has flowed directly into the canal or into improvised septic systems.

These communities fall well below the poverty line. Many residents are the backbone of San Juan's skilled labor force, and their purchases sustain many of the city's small businesses. These are, as the Puerto Rican legislature has recognized, "communities of irreplaceable importance for the city." Act of September 24, 2004, No. 489, Statement of Motives.

The canal area is, however, also in a state of environmental crisis that has threatened the whole San Juan Bay Estuary system. The wetlands have become dry land. The canal,

once some four hundred feet wide at points, has shrunk so much that it no longer serves as the vital link between the San José Lagoon and San Juan Bay. Instead, water from the Lagoon floods the settlements, dredging up raw sewage and eighty years' worth of detritus, sweeping away the ground beneath the homes, and imperiling residents.

By 2001, the Commonwealth and the U.S. Army Corps of Engineers, recognizing the severity of this problem, had committed to a far-reaching project to dredge the canal, restore the flow of water, and clean up decades of environmental pollution. Because the lack of sewage systems has been a major source of pollution, as well as a major health hazard, the government has also committed to rehabilitating and revitalizing the canal and its communities as a central aspect of this project. The government estimates that the project will take at least twenty years to complete.

This project has the potential to transform the canal and its surrounding land, and community residents have a strong stake in shaping its direction. Dredging the canal means relocating those canal residents located closest to the water; rehabilitating and revitalizing the area also means that it will be more attractive to commercial developers. Sensitive to these concerns, a central purpose of the rehabilitation project, designated the Martin Peña ENLACE Project, is to ensure the long-term survival of canal communities.

While the Commonwealth has repeatedly assured residents that forced relocation is not an option, the project has nonetheless generated pressing questions about land ownership in the canal area. Various public agencies of the Commonwealth and Municipality had some claim to title on several hundred acres of this land. Other parcels of land were abandoned when settlers arrived, and some have been abandoned since. The contours of the land have changed as the canal receded. Settlers have, in any event, occupied the lands surrounding the canal indiscriminately, in some cases for many decades, further complicating questions of land ownership. In the past, the Commonwealth and the Municipality experimented with different processes for recognizing residents' titles to land they have long occupied. But many of these processes may not have complied with basic property registration requirements under Puerto Rican law, leaving many residents uncertain about whether they own the land upon which they live.

In practice as well as in name, the ENLACE Project has relied on community engagement to develop solutions to these difficult questions. Beginning in 2001, residents, under the auspices of the Commonwealth's Department of Transportation and Public Works and the Highways and Transportation Authority, started developing a land-use plan tailored to residents' social, economic, and environmental needs. Three years and several hundred community meetings later, participants agreed on a community land trust model

to solve the ownership question and to manage the lands in the canal area for the community at large.[4]

On September 24, 2004, Puerto Rico enacted Law 489, which spelled out how the environmental rehabilitation of the canal and the preservation and revitalization of its surrounding communities would be implemented.  The law adopted the model of "integrated development based on community empowerment" as "the public policy of the Commonwealth of Puerto Rico."  P.R. Laws Ann. tit. 23, § 5032.  Law 489 again committed the government to minimizing residents' dislocation as the rehabilitation of the canal proceeded.  See id.  It also created two entities, the Corporation and the Fideicomiso, which were charged with implementing particular aspects of these broader goals.  Id. §§ 5033, 5048.

The Corporation was charged with coordinating and implementing all aspects of the dredging of the canal, housing development, and urban planning in the canal area, and was to ensure active and constant participation by canal residents.  Id.

---

[4]     Community land trusts (CLTs) have long been championed as a solution to the problem of affordable housing in urban communities.  See J.J. Kelly Jr., Land Trusts that Conserve Communities, 59 DePaul L. Rev. 69, 70-71 (2009).  CLTs are usually nonprofit, democratically run organizations of community members that own land in the area and hold it in trust for the community's benefit, while selling or leasing the homes built upon the land at low cost.  Id.  Because the trust cannot generally sell the underlying land and can usually place conditions on the sale of homes on the land, both of which are true here, the CLT model aims to rehabilitate urban communities while deterring land speculation and gentrification by private developers.  Id. at 79-84.

§ 5033. As part of that process, article 16 of Law 489 mandated that title to any lands in the canal area owned or managed by public agencies of the Commonwealth or Municipality would automatically pass to the Corporation 160 days after Law 489 took effect. Id. § 5045. Article 17 further provided that once the Commonwealth determined which lands around the canal were part of the maritime-terrestrial zone and in the public domain, the remaining lands would be "declared patrimony of the Commonwealth under the ownership rights of the Corporation," and title would formally transfer to the Corporation. Id. § 5046.

The Fideicomiso, as a land trust, was to be created from the lands the Corporation received from public agencies under article 16 and the public patrimony lands the Corporation held under article 17. Id. § 5048. The transfer of these lands from the Corporation to the Fideicomiso was to occur once the Corporation prepared regulations to govern the Fideicomiso's operations. Id. The Fideicomiso's purposes, under Law 489, included "contribut[ing] toward the solution of the ownership rights problem of many District residents through collective land-holding," id. § 5048(a)(1), and "acquir[ing] and possess[ing] lands on behalf of the community, thus increasing local control over the land and avoiding absentee owner decision-making," id. § 5048(a)(4).

-12-

Regulations governing the Fideicomiso's operations were promulgated in 2008.  They again stressed the Fideicomiso's role as a "mechanism of collective possession in order to solve the problem of the lack of ownership titles" and to "avoid involuntary displacement" of canal residents.  Land Trust Regulations art. I, § 1.  They further emphasized the Fideicomiso's mission "to own, watch over and administer all lands that the Corporation transfers to it" and any future land it acquires, a mission that precluded the Fideicomiso from selling these lands.  Id. art. III, § 3.2. The land transfer proceeded, and on May 14, 2009, the Corporation formally deeded the public lands it had received to the Fideicomiso.

One month later, on June 18, 2009, the Puerto Rican government--now under the leadership of a different political party --enacted Law 32.  Law 32 retroactively amended article 16 of Law 489 so that title to any properties held by the Corporation or the Fideicomiso that had been transferred by the Commonwealth or Municipality would revert back to them.  Act of June 23, 2009, No. 32, art. 1.  Law 32, by its terms, left intact most of the rest of Law 489, including its statement of goals and section 5048, the section that created the Fideicomiso.  See id.

Law 32 does not place any conditions on what the Municipality can do with these lands, though the rest of Law 489, which sets out a comprehensive plan for the future of the canal

-13-

area, remains in effect.  See id.  Under Law 32, Commonwealth agencies that originally held lands in the canal area are to study the status of the titles and determine whether the agency should retain the lands or should instead transfer them.  Id.  Agencies can transfer the land so long as the transfer would not impede citizens' access to essential services.  Id.

When Law 32 was enacted, the Fideicomiso had claimed title to approximately two hundred acres of land, all of which had originally been held by the Commonwealth or Municipality and had been transferred from the Corporation to the Fideicomiso.  At present, these are lands where canal residents live and have built themselves homes.

After initial skirmishes over whether the Fideicomiso could get a temporary restraining order or preliminary injunction to stop Law 32 from taking effect, on November 10, 2009, the district court issued an opinion in which it declined to reach the question of preliminary injunctive relief.  Instead, it dismissed the case and abstained under the Pullman abstention doctrine.[5]  See Fideicomiso de la Tierra del Caño Martin Peña v. Fortuño, 670 F. Supp. 2d 132, 141-42 (D.P.R. 2009).  The Fideicomiso now appeals.

---

[5]     Under Pullman abstention, federal courts ordinarily stay the federal action instead of dismissing it.  Mangual v. Rotger-Sabat, 317 F.3d 45, 63 (1st Cir. 2003).  We do not need to reach the issue of whether the failure to stay was error.

-14-

II.  Jurisdiction

We first address some basics.  Article III limits our jurisdiction to "cases and controversies," and our "obligation to inquire <u>sua sponte</u> into our jurisdiction over the matter" exists in every case.  <u>Doyle</u> v. <u>Huntress, Inc.</u>, 419 F.3d 3, 6 (1st Cir. 2005).

That obligation extends to determining whether a party has constitutional standing to sue, meaning that it has suffered an injury in fact "causally connected to the challenged conduct" and capable of being remedied through suit.  <u>Pagán</u> v. <u>Calderón</u>, 448 F.3d 16, 27 (1st Cir. 2006) (citing <u>Lujan</u> v. <u>Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992)).

Though the defendants have asserted that the Fideicomiso never legally owned the lands transferred to it by the Corporation, that argument does not deprive the Fideicomiso of Article III standing.  We need not define the precise nature of the Fideicomiso's interests in these lands to hold that they are sufficient to establish an injury in fact if Law 32 is enforced. Law 32 is directed explicitly at the Fideicomiso and creates an injury in fact by its very terms, which state that any Commonwealth and municipal lands transferred to the Fideicomiso will immediately return to it.  Act of June 23, 2009, No. 32, art. 1.  Article III standing is no bar to our exercise of jurisdiction in this case.

-15-

To the extent that the question of ripeness presents Article III limitations on our jurisdiction, there is no such jurisdictional hurdle on the theory pled here. It is true that Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City, 473 U.S. 172 (1985), held a plaintiff's claim for just compensation under the Takings Clause was unripe where the plaintiff had not gone through state procedures for obtaining compensation. Id. at 195. But there is no just compensation claim here.

We agree with the vast majority of circuits to address this issue, which have held that this ripeness requirement of going through state procedures does not apply to claims that a taking was not for a "public use." See Carole Media LLC v. N.J. Transit Corp., 550 F.3d 302, 308 (3d Cir. 2008); Rumber v. Dist. of Columbia, 487 F.3d 941, 944 (D.C. Cir. 2007); Montgomery v. Carter County, 226 F.3d 758, 766-68 (6th Cir. 2000); McKenzie v. City of White Hall, 112 F.3d 313, 317 (8th Cir. 1997); Armendariz v. Penman, 75 F.3d 1311, 1320-21 & n.5 (9th Cir. 1996) (en banc), abrogated on other grounds by Lingle v. Chevron U.S.A., Inc., 544 U.S. 528 (2005); Samaad v. City of Dallas, 940 F.2d 925, 936-37 (5th Cir. 1991); but see Forseth v. Vill. of Sussex, 199 F.3d 363, 369 N.8, 372-73 (7th Cir. 2000). That is so because "[p]rivate-use takings . . . are unconstitutional regardless of whether just compensation is paid," and, unlike just compensation claims, state

-16-

proceedings to determine appropriate compensation would not obviate the constitutional question. Montgomery, 226 F.3d at 766-67.

Nor is this a case where the federal courts should decline to exercise jurisdiction under the discretionary doctrine of Pullman abstention. Pullman abstention avoids unnecessary federal court interference by deferring to state courts on important, unsettled areas of state law; however, it is appropriate only when "substantial uncertainty exists over the meaning of the state law in question, and . . . settling the question of state law will or may well obviate the need to resolve a significant federal constitutional question." Batterman v. Leahy, 544 F.3d 370, 373 (1st Cir. 2008). The latter condition is not satisfied here.

The Fideicomiso's Takings Clause claim does not turn on questions of Puerto Rican law, including questions of whether the Corporation could legally transfer public agencies' lands to the Fideicomiso, whether the Fideicomiso is a public or private entity,[6] its powers as a trust, or whether the lands in question

---

[6] On appeal, the parties focus on this issue as central to whether the Fideicomiso could state a claim under the Takings Clause, on the theory that there can be no taking if the Fideicomiso had no cognizable property rights. The Fourth Circuit has instead characterized whether a plaintiff is a public entity capable of suing the state for an alleged constitutional violation as an Eleventh Amendment issue because of the stakes for the state's sovereign dignitary interests. See Virginia v. Reinhard, 568 F.3d 110, 122-23 (4th Cir. 2009). We need not engage in an Eleventh Amendment analysis. Other circuits have classified this question yet differently under the rubric of standing, see, e.g., id. at 123 n.3 (collecting cases), though the reasoning in some cases has not invoked Article III considerations. Id.

are considered private property, all of which are bitterly contested. See Fideicomiso, 670 F. Supp. 2d at 137-40.

The gravamen of the Fideicomiso's Takings Clause claim is that it is entitled to stop the alleged taking entirely, as opposed to receiving just compensation, because Law 32 is not a taking for "public use." Irrespective of whether the Fideicomiso is, as it claims, a private owner of lands considered private property under Puerto Rican law, it cannot obtain the relief it seeks if its "public use" argument fails. Unlike the ancillary questions identified by the district court, this is a question of federal constitutional law. See Kelo v. City of New London, 545 U.S. 469, 479-83 (2005). Because the Fideicomiso cannot prevail on its argument that Law 32 is not for "public use," as discussed below, abstention is unwarranted.

---

Whatever the formal label, this is not the kind of jurisdictional issue we must address first under Steel Company v. Citizens for a Better Environment, 523 U.S. 83 (1998). See Davignon v. Clemmey, 322 F.3d 1, 11 (1st Cir. 2003) (interpreting Steel Company as holding that difficult jurisdictional questions need only be addressed before the merits if they implicate Article III's "case or controversy" requirement). Instead, this is the kind of thorny question we have avoided when, as here, another issue is dispositive. See Parella v. Ret. Bd. of the R.I. Employees' Ret. Sys., 173 F.3d 46, 56 n.6, 58-62 (1st Cir. 1999) (avoiding deciding whether the defendant was an "arm of the state" for Eleventh Amendment purposes because plaintiffs' Takings and other constitutional claims failed on the merits).

We do not reach this issue, and for this reason, we also do not address the Seventh Circuit's opinion in Illinois Clean Energy Community Foundation v. Filan, 392 F.3d 934 (7th Cir. 2004), which held that a foundation created by statute was not a state agency and could bring a Takings Clause claim against the state. Id. at 936-37.

III.   The Takings Clause "Public Use" Claim

The public use requirement of the Takings Clause mandates that "one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid." Thompson v. Consol. Gas Utils. Corp., 300 U.S. 55, 80 (1937).   Under those circumstances, a "plaintiff that proves that a government entity has taken its property for a private, not a public, use is entitled to an injunction against the unconstitutional taking, not simply compensation." Carole Media, 550 F.3d at 308; see also Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1521-22 (D.C. Cir. 1984), rev'd on other grounds sub nom, Weinberger v. Ramirez de Arellano, 741 U.S. 113 (1985).   Plaintiff's claim falls under this public use branch of the doctrine.

The Fideicomiso says that the alleged "taking" under Law 32 is not for "public use" because it serves no legitimate purpose and undercuts the purposes of Law 489.   It argues that the government has failed to consistently identify any legitimate goal for Law 32.   Even if the government had, the Fideicomiso further argues, Law 32's alleged confiscation and transfer of lands to public agencies bears no reasonable relationship to any possible legitimate purpose.   This is so not least because Law 32, in the Fideicomiso's view, relieves public agencies from the obligation to advance the goals of the ENLACE Project identified in Law 489.

-19-

These goals in Law 489 are indisputably public purposes.[7]  The end result of Law 32, the Fideicomiso warns, will be to end community participation in the ENLACE Project, to allow public agencies to facilitate speculation by private developers, and to displace community residents.

These are serious arguments, but they are not grounds for a claim under the Takings Clause of the U. S. Constitution.  Public policy disagreements about the best of several rational means to accomplish legitimate public purposes are not the grist of a Takings Clause claim.  Our review of whether a taking is for "public use" is necessarily deferential: "When the legislature's purpose is legitimate and its means are not irrational, . . . empirical debates over the wisdom of takings . . . are not to be carried out in the federal courts." Haw. Housing Auth. v. Midkiff, 467 U.S. 229, 242-43 (1984); see also Goldstein v. Pataki, 516 F.3d 50, 57-58 (2d Cir. 2008).

Well before the Kelo decision, the Supreme Court had recognized two categories of quintessentially legitimate public uses under the Takings Clause: takings that transfer private property to public ownership, resulting in the administration of lands for the public good, see, e.g., Old Dominion Land Co. v.

---

[7]    The fact that under Law 489 the land may, after improvements, be leased to private parties does not mean that Law 489 lacks a public purpose, see Berman v. Parker, 348 U.S. 26, 33-36 (1954), nor does the Fideicomiso so argue.

<u>United States</u>, 269 U.S. 55, 66 (1925); <u>United States</u> v. <u>Gettysburg Elec. Ry. Co.</u>, 160 U.S. 668, 681-83 (1896); <u>Shoemaker</u> v. <u>United States</u>, 147 U.S. 282, 297 (1893), and takings that make property available for use by the general public, see <u>Kelo</u>, 545 U.S. at 478-79 (noting that this category has long been deemed "sufficient to satisfy the public use requirement"). These two categories, of course, continue to be legitimate public uses under <u>Kelo</u>.

Law 32, by its terms, revokes the transfer of public agencies' lands to the Fideicomiso and returns the lands to public ownership through agencies of the Commonwealth and the Municipality.[8] This transfer to public ownership reflects the Commonwealth's judgment that the goals of rehabilitating and revitalizing the canal will be better served, and will be consistent with other missions of its public agencies, if these agencies, rather than the Fideicomiso and the Corporation, again hold and administer the lands in the canal area they once owned. There can be no doubt that Law 32's transfer to public ownership is for "public use" under the Takings Clause.[9]

---

[8] Thus the category of cases in which the property is transferred to another private party, see, e.g., <u>Kelo</u>, 545 U.S. at 478-83; <u>Midkiff</u>, 467 U.S. at 241-42; <u>Berman</u>, 348 U.S. at 33-36, is not involved here.

[9] At oral argument, the government represented that those public agencies must, under Law 32, continue to administer the lands for the benefit of canal residents and for all the other stated public purposes originally articulated in Law 489.

The Fideicomiso's argument is largely that it disagrees with the different choice of mechanisms made in Law 32, as opposed to those originally made in Law 489, to effectuate public purposes. The tensions the Fideicomiso identifies between Law 32 and Law 489 do not make Law 32's transfer of lands to public agencies an irrational or even a suspect means of achieving public purposes. Law 32 itself says its purpose is to harmonize Law 489 with other laws and to clarify that public domain lands are not transferrable. The government has argued that through Law 32, experienced public agencies will regain ownership of lands in the canal, and this will facilitate better and faster completion of projects to advance the area's revitalization and development. The government argues that five years have passed under the Fideicomiso land trust model and there has been no real progress towards meeting Law 489's environmental rehabilitation and development goals. All of this, the government concludes, justifies a different approach. Whatever the wisdom of this choice of different means by the legislature and governor, a federal court cannot conclude Law 32 was an illegitimate means of advancing a public purpose, not least because transfers of private property to public ownership have been upheld since the founding of our country.

There are no other circumstances presented by this case that would warrant the remedies of injunctive and declaratory relief for the Fideicomiso's Takings Clause claim. The Fideicomiso

says if Law 32 goes into effect, the Fideicomiso will be prevented from carrying out its statutory purpose; that may be true. It does not follow, as the Fideicomiso argues, that the communities surrounding the canal will be dislocated as a result. "Irreparable harm" in the takings context cannot simply mean the risk that the means the government has chosen to implement a public policy will have undesirable consequences.[10] The Takings Clause is not a means for federal courts to second-guess the legislature's choices about the best mechanisms to achieve what are undeniably public policy goals.

## IV. Other Constitutional Claims

In its complaint, the Fideicomiso cursorily challenged Law 32's constitutionality under the Due Process Clause, the Contracts Clause, and the Ex Post Facto Clause. But the Fideicomiso did not develop these arguments before the district

---

[10] Though the Supreme Court has granted declaratory and injunctive relief for a limited number of Takings Clause claims beyond "public use" challenges, it has also made clear that these cases are exceptional and limited to their facts. Those cases, moreover, involved regulatory takings, not physical takings. See E. Enterprises v. Apfel, 524 U.S. 498, 521-22, 528-537 (1998) (plurality opinion) (granting declaratory and injunctive relief for a regulatory takings claim on the facts of a Tucker Act case where the alleged taking resulted in severe, retroactive, and unforeseeable liability for a small number of parties and the Claims Court process would not provide a sufficient remedy); Babbitt v. Youpee, 519 U.S. 234, 237, 243-45 (1997) (invalidating and enjoining further enforcement of a federal statutory provision that effectively eliminated certain Native American landowners' ability to leave fractional interests in property to their successors); Irving v. Hodel, 481 U.S. 704, 716-18 (1987) (invalidating and enjoining an earlier version of this provision).

court, nor has it preserved them for appeal. The Fideicomiso's motion for a preliminary injunction centered entirely on the merits of its Takings Clause claim. It mentioned its other claims only in passing, omitting both case citations and any indication of the gravamen of these claims. The Fideicomiso's brief on appeal likewise relies solely on its Takings Clause claim to argue the merits of its case. That is waiver; we do not reach these other claims. See Mass. Museum of Contemporary Art Found. v. Büchel, 593 F.3d 38, 65 (1st Cir. 2010).

We vacate the district court's judgment and the stay we entered, and we direct entry of judgment of dismissal with prejudice of all federal claims and dismissal of all claims under Puerto Rican law without prejudice. No costs are awarded.

So ordered.

**-Concurring Opinion Follows-**

**TORRUELLA**, **Circuit Judge** **(Concurring).** I join the majority in holding that Plaintiff-Appellant, Fideicomiso del Caño Martín Peña ("the Fideicomiso"), cannot show that Law 32 fails to pursue a "public use" as required by the Fifth Amendment's public use clause.[11] I write separately to clarify my view that Law 32 pursues the public purposes of economic, social, environmental, and community redevelopment that were carefully plotted in Law 489. Under settled Supreme Court precedent, -- including the latest decision in Kelo v. City of New London, 545 U.S. 469 (2005) -- economic and community redevelopment are legitimate public purposes. Viewing Law 32 within the statutory and regulatory framework adopted by Law 489, it is manifest that Law 32 pursues these public goals through public ownership of lands. Eschewing any views regarding the wisdom of transferring lands to public ownership in order to effectuate the goals of the ENLACE Project, I cannot say that Law 32 lacks a public purpose.

---

[11]The Takings Clause of the Fifth Amendment applies to the states through the Fourteenth Amendment. Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 536 (2005). Though the Supreme Court has not held that the Takings Clause of the Fifth Amendment is applicable to the Commonwealth of Puerto Rico, we have dispelled any "doubts" regarding the application of the clause to the Commonwealth of Puerto Rico. Tenoco Oil Co., Inc. v. Dep't of Consumer Affairs, 876 F.2d 1013, 1017 n.9 (1st Cir. 1989); see also Culebras Enter. Corp. v. Rivera Ríos, 813 F.2d 506 (1st Cir. 1987) (assuming, in the context of an inverse condemnation action under Puerto Rico law, that the Takings Clause applies to the Commonwealth of Puerto Rico).

**I.**

In 2001, the Commonwealth of Puerto Rico ("the Commonwealth") developed a comprehensive development project denominated the Martín Peña Canal ENLACE Project (the "ENLACE Project") under the direction of the Department of Transportation and Public Works. The project's stated purpose was to rehabilitate and revitalize the Martín Peña Canal District. The ENLACE Project came to fruition on September 24, 2004 when the Commonwealth's legislature promulgated Law 489, also known as "the Martín Peña Canal Special Planning District Integrated Development Act." P.R. Laws Ann. tit. 23, §§ 5031-5066. Among other things, Law 489 articulated clear public policy goals: (1) to rehabilitate the San Juan Bay Estuary; (2) to improve the living conditions of the communities located along the Martín Peña Canal through community empowerment; and (3) "[t]o promote civic and democratic development through the active participation of the residents in the planning and rehabilitation processes of the area." Id. § 5032. Law 489 established two basic entities to pursue these goals: the ENLACE corporation and the Fideicomiso, or Land Trust.

The ENLACE Corporation was endowed with the responsibility of "coordinating the implementation of all aspects of the ENLACE Project; including, without being limited to, housing development, infrastructure, the dredging and canalization of the Canal, as well as urban and socio-economic development." Id.

-26-

§ 5033(1). In turn, the Fideicomiso was created to, inter alia, deal with land ownership issues; acquire and possess lands on behalf of the community; handle the displacement of the low-income residents; guarantee affordable housing; and foster "participation of the residents and the strategic investment of the private sector." Id. § 5048(a)(5).

By virtue of Law 489, all publicly-held lands within the District were transferred to the ENLACE Corporation. Id. § 5045. ("The public agencies . . . that manage, hold in custody, have dominion over, lease or own lands in the District shall be understood through this chapter as having transferred the respective title to the Corporation after one hundred sixty days (160) as of the effectiveness thereof."). Ownership rights over "lands of public domain or patrimony" remained "vested" in the ENLACE Corporation, with certain exceptions regarding lands in the maritime-terrestrial zone. Id. Ultimately, these lands were to be transferred from the Corporation to the Fideicomiso. Id. § 5048 ("The Martín Peña Canal Land Trust . . . shall consist of all the lands transferred to the Corporation.").

In May 2007, the Integral Development and Land Use Plan of the Special Planning District of the Caño Martín Peña was approved by the Governor of Puerto Rico. The Plan sought to "improve the quality of life of the residents of the District through mechanisms aimed at overcoming poverty, [and] harmonizing

the relationship between the District's communities and their natural environment . . . ." Appellant's Appendix, Vol. III, Exhibit E at 1432.

On June 18, 2009, the Commonwealth's legislature passed Law 32 "to amend Article 16 of Law No. 489 of September 24, 2004."[12] Law 32 provides, inter alia, that "any of the[] properties which have been transferred to the Corporation or [the] Fideicomiso, will revert to the original Agency or Title Holder," and "[a]ny lot or parcel of land which by virtue of Law 489 has been registered in the name of the Corporation or the Fideicomiso, will revert to its original titleholder condition until such time as every study, action or procedure has been accomplished in accordance with this Act." Law 32 also revoked any transfers of Municipal lands to the Fideicomiso or the ENLACE Corporatión, and invalidated any efforts by the Fideicomiso or the ENLACE Corporation to register Municipal lands in their names.

After the Governor of Puerto Rico signed Law 32, the Fideicomiso filed the present suit challenging Law 32 under the Takings and Due Process clauses of the 5th and 14th Amendments to the United States Constitution and equivalent provisions of the Puerto Rico Constitution. The Fideicomiso stresses that the Government has failed to articulate a coherent and legitimate

_____

[12]As previously mentioned, Article 16 of Law 489 provided for the transfer of lands in the Martín Peña Canal District to the ENLACE Corporation.

-28-

explanation of the public purposes behind Law 32.  The Fideicomiso also contends that in allowing the Commonwealth to place land titles among a host of public agencies, Law 32 contravenes Law 489's goals to foster community participation, and avoid speculation and displacement of the communities.  On the other hand, the Commonwealth argues that governmental control over the lands would jump-start the ENLACE Project which was delayed for close to five years due to what the government claims was the Fideicomiso's inability to complete the different stages of the ENLACE Project in a timely fashion.  The Commonwealth further explains that Law 32 creates a mechanism to allow public agencies to participate in the ENLACE Project.

## II.

The Fideicomiso, as "a party challenging governmental action as an unconstitutional taking[,] bears a substantial burden" in this case.  E. Enter. v. Apfel, 524 U.S. 498, 523 (1998).  Supreme Court precedent requires this court to defer to legislative judgments of what constitutes a public use or purpose.  See Kelo, 545 U.S. at 480 ("Without exception, our cases have defined that concept [public purpose] broadly, reflecting our longstanding policy of deference to legislative judgments in this field.");  Hawaii Hous. Auth. v. Midkiff, 467 U.S. 229, 240 (1984).  Once a public use is established, we owe deference to the legislative judgment regarding the means chosen to attain it.  Berman v.

-29-

Parker, 348 U.S. 26, 33 (1954) ("Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine."); Old Dominion Land Co. v. United States, 269 U.S. 55, 66 (1925) (holding that once Congress declared a public use, "[i]ts decision is entitled to deference until it is shown to involve an impossibility").

However, deference to the legislature in the takings context does not mean abdication of the court's duty to find that there is indeed a public purpose being served. Despite the Fideicomiso's better efforts to show that Law 32 lacks any public use or purpose, a review of Law 32 reveals that in passing the statute, the Commonwealth's legislature simply chose different means to achieve the goals and undoubtedly public purposes that were carefully delineated in Law 489. Also, as the majority opinion recognizes, Law 32 transferred lands to public ownership, thereby meeting an undoubtedly public purpose.

It is of utmost importance to clarify that Law 32 amended one Article of Law 489 -- Article 16 -- and maintained Law 489's comprehensive provisions that define the policy goals behind the ENLACE Project. As the Commonwealth argues, the principles, purposes, and objectives of Law 489 are in effect. In enacting Law 32, the Commonwealth's legislature simply chose alternate means to achieve the development and rehabilitation goals set forth in Law 489. Absent any indication that Law 32 amounts to an unreasonable

or irrational avenue to undertake the ENLACE Project, we cannot second-guess the legislature in this case. Midkiff, 467 U.S. at 242-43 ("When the legislature's purpose is legitimate and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings -- no less than debates over the wisdom of other kinds of socioeconomic legislation -- are not to be carried out in the federal courts.").

Furthermore, the claim that Law 32 is devoid of any public use is inconsistent with the broad interpretation the Supreme Court has given to the Fifth Amendment's public use requirement. See Berman, 348 U.S. at 33 (recognizing that community redevelopment served a public purpose and stating that "[i]t is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled"); Midkiff, 467 U.S. at 242 (holding that state efforts to avert land oligopoly and correct deficiencies in the land market served a valid public purpose); Nat'l R.R. Passenger Corp. v. Boston & Maine Corp., 503 U.S. 407, 422-23 (1992)(upholding determination that transfer of railroad tracks from one party to another that would better maintain the tracks pursued the valid public purpose of facilitating rail operations). In its recent decision in Kelo, the Supreme Court held that a "carefully considered" economic development plan which was found to have been adopted after

"thorough deliberation", satisfied the public use requirement. 545 U.S. at 478, 484. In so holding, the court recognized the principle that a carefully considered governmental economic development plan pursues a public use where the scheme seeks to promote economic redevelopment and is designed to provide economic benefits to the community.

It is uncontested that the ENLACE Project was adopted to rehabilitate and revitalize the Martín Peña Canal and its communities; it seeks to conduct extensive public works and improvements; and to deal with environmental degradation, and land-ownership issues. These are public purposes that were adopted in the context of a thorough, comprehensive, and detailed development plan, that pursuant to Law 32 will be carried out through the intervention and active participation of several public agencies. In light of the Supreme Court's decision in Kelo, it is clear that the ENLACE Project serves valid public purposes. While Law 32 altered the statutory scheme that was put in place by Law 489, the ENLACE Project is still alive and there is no indication that the Commonwealth has abandoned the goals of rehabilitating and revitalizing the Martín Peña Canal. The mere fact that the Commonwealth's legislature decided to pursue the goals of the ENLACE Project by transferring lands from the Fideicomiso to a host of public agencies does not render Law 32 unconstitutional under

the Takings Clause.[13]   More importantly, it is manifest that a governmental project by which the government owns and administers lands for the  benefit of the public or community pursues a valid public purpose.  Cf. Rindge Co. v. Los Angeles County, 262 U.S. 700, 706-07 (1923) (recognizing that the taking of property to build a highway is one for public use and explaining that "[i]t is not essential that the entire community, nor even any considerable portion, should directly enjoy or participate in an improvement in order to constitute a public use").

    Law 32 reflects a legislative judgment that the public purpose of community redevelopment in the Martín Peña Canal district is better served through public ownership of the lands in controversy.  Because I cannot deem Law 32 as employing irrational means to achieve the public goals delineated in Law 489, I join the majority in holding that the Fideicomiso's challenge under the public use clause fails on the merits.

---

    [13]The determination that the Fideicomiso cannot succeed in its claim that Law 32 is facially unconstitutional should not be interpreted as barring future as-applied takings challenges if it is shown that lands in the Martín Peña Canal District are taken for purely private purposes, Midkiff, 467 U.S. at 245, or "under the mere pretext of a public purpose," Kelo, 545 U.S. at 478.