10-4497-cv
*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: January 24, 2012                                    Decided:  April 2, 2013)

Docket No. 10-4497-cv

_____

PENSION BENEFIT GUARANTY CORP., on behalf of Saint Vincent Catholic Medical
Centers Retirement Plan, SAINT VINCENT CATHOLIC MEDICAL CENTERS,
QUEENSBROOK INSURANCE LTD.,

*Plaintiffs-Appellants,*

v.

MORGAN STANLEY INVESTMENT MANAGEMENT INC.,

*Defendant-Appellee.*

_____

Before: CABRANES, STRAUB, and LIVINGSTON, Circuit Judges.

In this appeal we consider the degree of factual detail needed in a complaint in order to

present nonconclusory and plausible allegations that a pension plan administrator purchased and

continued to hold certain mortgage-backed securities in violation of its fiduciary duties under the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*  We agree

with the United States District Court for the Southern District of New York (P. Kevin Castel, *Judge*)

that the amended complaint fails to allege facts supporting the plausible inference that defendant-

appellee knew, or should have known, that the particular mortgage-backed securities in the relevant

1

portfolio were imprudent investments. In particular, the complaint relies on the decline in the market price of mortgage-backed securities generally, without specifying the securities at issue or presenting any facts to suggest that a reasonable investor would have viewed those securities as imprudent investments. As we explain, a decline in market price of a type of security does not, by itself, give rise to a reasonable inference that it was imprudent to purchase or hold that type of security.

Affirmed.

Judge Straub dissents in part and concurs in part in a separate opinion.

> ERIC B. FISHER, Dickstein Shapiro LLP, New York, NY; (Israel Goldowitz, Chief Counsel; Charles L. Finke, Deputy Chief Counsel; Joel W. Ruderman, Assistant Chief Counsel; Kelly R. Cusick, Attorney; Scott Wagner, Attorney, *on the brief*), Office of Chief Counsel, Pension Benefit Guaranty Corporation, Washington, DC; (Judith Starr, General Counsel; Kenneth Cooper, Assistant General Counsel; Greg Matisoff, Attorney, *on the brief*), Office of General Counsel, Pension Benefit Guaranty Corporation, Washington, DC, *for Plaintiffs-Appellants*.

> RICHARD A. ROSEN (Andrew W. Amend, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, *for Defendant-Appellee*.

JOSÉ A. CABRANES, *Circuit Judge*:

In this appeal we consider the degree of factual detail needed in a complaint in order to present nonconclusory and plausible allegations that a pension plan administrator purchased and continued to hold certain mortgage-backed securities in violation of its fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

In an effort "to ensure that employees will not be left emptyhanded once employers have guaranteed them certain benefits," ERISA imposes "a duty of care with respect to the management of existing trust funds, along with liability for breach of that duty, upon plan fiduciaries" who

2

administer benefit-plan assets. *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). In particular, ERISA requires fiduciaries to use "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

Like many recent cases, this suit stems from the real-estate bubble and subsequent financial crisis that unfolded over the past decade. Plaintiffs-appellants Saint Vincent Catholic Medical Centers, Pension Benefit Guaranty Corp., and Queensbrook Insurance Ltd. (jointly, "Saint Vincent's") allege that defendant-appellee Morgan Stanley Investment Management Inc. ("Morgan Stanley")—the fiduciary manager of the fixed-income portfolio of the Saint Vincent Catholic Medical Centers Retirement Plan ("the Plan")—violated its fiduciary duties under ERISA. In particular, Saint Vincent's alleges that Morgan Stanley disproportionately invested the portfolio's assets in mortgage-backed securities, including the purportedly riskier subcategory of "nonagency" mortgage-backed securities, despite warning signs that these investments were unsound.

The United States District Court for the Southern District of New York (P. Kevin Castel, *Judge*) dismissed the suit under Rule 12(b)(6) of the Federal Rules of Civil Procedure, concluding that the Amended Complaint fails to allege facts supporting a plausible inference that Morgan Stanley knew, or should have known, that securities held in the Plan's portfolio were imprudent investments. In particular, the District Court explained that the Amended Complaint relies too heavily on facts known only in hindsight, and that its general allegations about warning signs relating to indistinct classes of securities do not give rise to a plausible inference that Morgan Stanley violated its fiduciary duty.

We agree. Although Saint Vincent's, as the fiduciary administrator of an ERISA-governed plan, was in a position to plead its claims with greater factual detail than is typically accessible to plaintiffs prior to discovery, and although it received two opportunities to amend its complaint, the

3

Amended Complaint fails to plead sufficient, nonconclusory factual allegations to show that Morgan Stanley failed to meet its fiduciary responsibilities under ERISA. Accordingly, we affirm the District Court's judgment dismissing the Amended Complaint.

## BACKGROUND

When the Amended Complaint was filed on February 17, 2010,[1] Saint Vincent Catholic Medical Centers[2] was a medical-care provider that operated St. Vincent's Hospital Manhattan and St. Vincent's Westchester, as well as other healthcare facilities in Brooklyn and Staten Island. As noted, Saint Vincent's was the sponsor and fiduciary administrator of the Saint Vincent Catholic Medical Centers Retirement Plan (the "Plan"), a defined-benefit pension plan for eligible retirees of Saint Vincent's.

---

[1] The plaintiffs originally filed suit on November 23, 2009. Saint Vincent's filed this suit "on its own behalf and as fiduciary of the Saint Vincent Catholic Medical Centers Retirement Plan," Am. Compl. ¶ intro., alleging that it is "the Plan's fiduciary and has authority to bring these claims pursuant to ERISA §§ 409 and 502(a)(2)," *id.* ¶ 6. The relevant provision of ERISA provides, in relevant part, that "a participant, beneficiary or fiduciary" may sue for a breach of fiduciary duty, *see* 29 U.S.C. § 1132(a)(2), and we have previously held that a plan sponsor cannot sue under this provision in its capacity "as an employer," *Tuvia Convalescent Ctr., Inc. v. Nat'l Union of Hosp. & Health Care Emps.*, 717 F.2d 726, 730 (2d Cir. 1983). Because Saint Vincent's brings this suit in its capacity as the fiduciary administrator of the Plan, *see generally* 29 U.S.C. § 1102(a)(2) (defining "named fiduciary"), which is clearly permitted under § 1132(a)(2), we have no reason to consider whether Saint Vincent's may bring this suit "on its own behalf," *cf., e.g.*, *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

[2] Saint Vincent Catholic Medical Centers petitioned for Chapter 11 bankruptcy relief on April 14, 2010. As a result of the financial difficulties of Saint Vincent Catholic Medical Centers, the Pension Benefit Guaranty Corporation ("PBGC")—an independent agency of the federal government, "created under ERISA to guarantee payment of all nonforfeitable pension benefits despite termination of the relevant pension plan," *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 518 n.14 (1981)—assumed responsibility for the administration of the Plan's assets and, in concert with Saint Vincent Catholic Medical Centers, "terminated" the Plan itself by agreement dated November 1, 2010, pursuant to 29 U.S.C. § 1342(c). As relevant here, PBGC has authority to "prosecute . . . on behalf of the plan any suit or proceeding involving the plan," *id.* § 1342(d)(1)(B)(iv), and, pursuant to that authority, has assumed responsibility for prosecuting this case. By order of this Court dated May 13, 2011, PBGC became an appellant. Because these procedural complications are irrelevant to the issues raised in this appeal, however, we refer to the plaintiffs-appellants jointly as "Saint Vincent's."

Also as a result of the financial difficulties of Saint Vincent Catholic Medical Centers, all of its facilities have been sold or closed. Most notably, St. Vincent's Hospital Manhattan, which served New York City's Greenwich Village for more than one hundred and fifty years, closed in 2010. Anemona Hartocollis, *Staff Says Goodbye to St. Vincent's Hospital*, N.Y. TIMES, May 1, 2010, at A15; *see also* Anemona Hartocollis, *The Decline of St. Vincent's Hospital*, N.Y. TIMES, Feb. 3, 2010, at A1. The buildings and property of the former hospital are being converted into luxury apartments. *See* Joseph De Avila, *St. Vincent's Site Moves On*, WALL ST. J., Sept. 15, 2011, at A22.

4

Saint Vincent's hired Morgan Stanley to manage the Plan's fixed-income portfolio ("the Portfolio"), which comprised about 35% of the Plan's assets.[3] As manager of the Portfolio, Morgan Stanley was subject to the fiduciary duties imposed by ERISA. *See* 29 U.S.C. § 1002(21).[4]

Saint Vincent's also provided Morgan Stanley with written investment guidelines (the "Guidelines"), specifying that the "primary investment objective for the Pension Plan shall be preservation of principal with emphasis on long-term growth to meet the future retirement liability of the Plan." Am. Compl. ¶ 20. The Guidelines designated the Salomon Brothers Broad Bond Index (now called the Citigroup Broad Investment Grade Bond Index, or the "Citigroup BIG") as "the applicable benchmark against which [Morgan Stanley's] performance as investment manager would be measured." *Id.* ¶ 21. The Portfolio was expected to "track and modestly exceed the performance of the Citigroup BIG." *Id.* ¶ 28. According to the Amended Complaint, "the selection

---

[3] Fixed-income securities, or bonds, "are debt instruments that represent cash flows payable during a specified time period. They are essentially loans. The cash flows they represent are the interest payments on the loan and the loan redemption." MOORAD CHOUDHRY, FIXED INCOME SECURITIES AND DERIVATIVES HANDBOOK: ANALYSIS AND VALUATION 3 (2010). "The mortgage market is the largest sector of the fixed-income market and mortgage securities are among the most actively traded securities in the fixed-income market." Thomas P. Lemke et al., Mortgage-Backed Securities § 4:1 (2012), *available at* Westlaw MortSec.

[4] In addition to requiring "one or more *named fiduciaries* who jointly or severally shall have authority to control and manage the operation and administration of the plan," 29 U.S.C. § 1102(a)(1) (emphasis supplied), ERISA provides that plan documents may permit "named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities," *id.* § 1105(c)(1), and, more specifically, "that a person who is a named fiduciary with respect to control or management of the assets of the plan may appoint an investment manager or managers to manage (including the power to acquire and dispose of) any assets of a plan," *id.* § 1102(c)(3). As relevant here, ERISA imposes fiduciary duties on "[a]ny person who is *a fiduciary* with respect to a plan," *id.* § 1102(a) (emphasis supplied), defined as follows:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). As the Supreme Court has explained, this definition is framed "not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan, . . . thus expanding the universe of persons subject to fiduciary duties." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993). Another feature of this definition is that if an entity acts in "dual roles" as a non-fiduciary and as a fiduciary, such as being a "plan sponsor and plan administrator," then "fiduciary duties under ERISA are implicated only when it acts in the latter capacity." *Beck v. PACE Int'l Union*, 551 U.S. 96, 101 (2007).

5

of the Citigroup BIG index as a benchmark signaled to [Morgan Stanley] that, as an ERISA fiduciary, it was required to execute a low-risk, conservative investment strategy." *Id.* ¶ 21.

In Count One, Saint Vincent's alleges that Morgan Stanley breached its fiduciary duties under ERISA by "deviat[ing] from the specified strategy and direct[ing] increasingly large amounts of the Plan's assets into high-risk investments including non-agency mortgage securities, thereby exposing the Plan to excessive risk." *Id.* ¶ 22. The Amended Complaint explains in a footnote that "[n]on-agency mortgage securities are securities tied to mortgages that are not guaranteed by Fannie Mae or Freddie Mac (the 'agencies') because the mortgages fail to meet the agencies' underwriting standards and criteria." *Id.* ¶ 22 n.2. According to the Amended Complaint, Morgan Stanley's investment decisions intentionally exceeded both the risk inherent in the Citigroup BIG and the "acceptable risk associated with the investment of a fixed-income portfolio." *Id.* ¶ 31. In the same vein, Morgan Stanley allegedly "failed to properly diversify the fixed-income portfolio, achieving a disproportionate exposure to the risk of the mortgage securities markets." *Id.* ¶ 32.

More particularly, the complaint alleges that during the fourth quarter of 2007, 12.6% of the Portfolio's value consisted of nonagency mortgage-backed securities, and during each quarter in 2008, the concentration of nonagency mortgage-backed securities exceeded 9%. By contrast, the Citigroup BIG apparently had "no exposure to non-agency mortgage securities." *Id.* ¶ 28. Similarly, the Amended Complaint alleges that the Portfolio's overall exposure to mortgage-backed securities (that is, both agency and nonagency mortgage-backed securities) "generally exceeded that of the Citigroup BIG by approximately 10%."[5] *Id.* ¶ 24. According to the Amended Complaint, these investments were imprudent and exposed the Plan to a disproportionate risk of a decline in the mortgage-backed securities market.

---

[5] The Amended Complaint does not allege the particular percentage of the Citigroup BIG concentrated in mortgage-backed securities.

6

Although it does not allege any facts regarding the process by which Morgan Stanley selected these securities, the Amended Complaint states that Morgan Stanley "knew or should have known that this overexposure to high-risk, mortgage securities was imprudent," *id.* ¶ 34, because "[t]hroughout 2007 and 2008, there were warning signs that these securities were not appropriate for the fixed-income portfolio," *id.* ¶ 35. Specifically, the Amended Complaint asserts that Morgan Stanley invested in "subprime mortgage securities issued by IndyMac, Bear Stearns, Washington Mutual and Countrywide, among others," *id.* ¶ 36, and that these issuers suffered large, publicly disclosed losses in 2007 and 2008 due to the subprime mortgage crisis. It further alleges that analysts predicted in 2007 that Morgan Stanley's parent company[6] would "write down $6 billion" on the value of "similar securities," *id.* ¶ 37, and that "[i]n December 2007, Standard & Poor's reduced its ratings on about $7 billion of Alt-A mortgage securities, [which are] loans considered a step above subprime," *id.* ¶ 42.

In terms of damages, the Amended Complaint alleges that the Portfolio suffered significant losses in value as a result of Morgan Stanley's failure to meet its fiduciary duties. Specifically, the Amended Complaint alleges that the Portfolio's purported overconcentration in nonagency mortgage-backed securities caused it to underperform relative to the Citigroup BIG. During 2008, for example, the Portfolio lost 12% of its value, whereas the Citigroup BIG gained 7%. *Id.* ¶ 26. Moreover, "during the relevant period of time, damages to the Plan's assets exceeded $25 million in the fixed-income portfolio managed by [Morgan Stanley]." *Id.* ¶ 27.

The Amended Complaint also includes two counts relating to Morgan Stanley's alleged mismanagement of a separate insurance fund. When Saint Vincent's facilities were still in operation, plaintiff-appellant Queensbrook Insurance Limited ("QIL"), then a wholly-owned subsidiary of

---

[6] For ease of readability, we use the short-hand "Morgan Stanley" to refer to defendant-appellee Morgan Stanley Investment Management Inc., whose parent company, Morgan Stanley, is not a party to this suit.

7

Saint Vincent's, provided malpractice insurance for Saint Vincent's. To this end, QIL established the Queensbrook Insurance Limited Account (the "Insurance Fund"), which Morgan Stanley administered. The Amended Complaint alleges that Morgan Stanley mismanaged the Insurance Fund in essentially the same way that it mismanaged the Portfolio. On this basis, the Amended Complaint asserts common-law claims against Morgan Stanley for breach of fiduciary duty and breach of contract.[7]

In a Memorandum and Order filed October 4, 2010, the District Court dismissed the Amended Complaint in its entirety. *See Saint Vincent Catholic Med. Ctrs. v. Morgan Stanley Inv. Mgmt. Inc.*, No. 09 Civ. 9730 (PKC), 2010 WL 4007224 (S.D.N.Y. Oct. 4, 2010) ("*Saint Vincent's*"). Observing that the Amended Complaint "contains no allegations of inadequacy of Morgan Stanley's investigation of the merits of its investments," the District Court concluded that the Amended Complaint was instead "premise[d] . . . on the poor results of the investments" made by Morgan Stanley. *Id.* at *4. This sort of "hindsight critique of returns," the Court explained, is inadequate to show a breach of fiduciary duty under ERISA. *Id.* at *5. The Court further concluded that the Amended Complaint fails to demonstrate how the alleged 10% variance between the Portfolio and the Citigroup BIG amounts to a breach of Morgan Stanley's duty under ERISA to exercise reasonable care. Having dismissed the ERISA claim, the District Court declined to exercise supplemental jurisdiction over the state-law claims. *Id.* at *6–7. The District Court provided 21 days for the plaintiffs to move to amend their complaint a second time, but no motion was forthcoming. The plaintiffs instead filed this appeal.

---

[7] QIL apparently brought these claims as state-law claims because the Insurance Fund is not an employee benefit plan and therefore is not covered by ERISA. *See* 29 U.S.C. § 1003(a).

## DISCUSSION

### A. Relevant Terminology

Before addressing the merits, we review the meaning of several important, though somewhat technical, terms used in the Amended Complaint. In particular, Saint Vincent's focuses on Morgan Stanley's purchase of what Saint Vincent's calls "non-agency mortgage securities." Am. Compl. ¶ 22. As we will see, this term covers a wide range of securities.

*Mortgage-backed securities* are securities whose collateral is a fractional share in a group (or "pool") of mortgages. To create this type of financial instrument, "[t]ypically, an entity (such as a bank) will buy up a large number of mortgages from other banks, assemble those mortgages into pools, securitize the pools (i.e., split them into shares that can be sold off), and then sell them, usually as bonds, to banks or other investors." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 710 n.3 (2d Cir. 2011) (quotation marks omitted). "As the mortgages within the pool are repaid, including principal and interest payments, all of those payments are channeled through a party that 'services' the pool of securities and distributes a *pro rata* share of the proceeds to holders of the securities, minus a small servicing fee." *Anchor Sav. Bank, FSB v. United States*, 81 Fed. Cl. 1, 16 (Fed. Cl. 2008) ("*Anchor Savings*"); *see also In re Lehman Bros. Mortgage-Backed Sec. Litig,*, 650 F.3d 167, 171 (2d Cir. 2011). As we now explain, mortgage-backed securities are often classified as "agency" or "nonagency" mortgage-backed securities.

*Agency mortgage-backed securities* use, as collateral, mortgages that meet the requirements to be "backed or issued by the three government-sponsored entities ('GSEs')—Ginnie Mae, Fannie Mae and Freddie Mac."[8] *Anchor Savings*, 81 Fed. Cl. at 16. When a mortgage is backed or issued by a GSE, the principal payments on the mortgage are effectively guaranteed by the Treasury of the

---

[8] Ginnie Mae, Fannie Mae, and Freddie Mac are short-hand names, respectively, for the Government National Mortgage Association, the Federal National Mortgage Association, and the Federal Home Loan Mortgage Corporation.

United States,[9] thus reducing the risk to the investor. *See id.* By contrast, "nonagency" mortgage-backed securities (also known as "private-label" mortgage-backed securities) use as collateral mortgages which are not underwritten by GSEs and "d[o] not meet the GSEs' strict underwriting criteria." *Id.* at 17. These criteria include: (1) a maximum payment-to-income ratio, which measures a borrower's ability to make monthly mortgage payments; (2) a maximum loan-to-value ratio, which measures the amount of the mortgage loan against the appraised value of the property; and (3) a maximum loan amount. *See id.*; *see also* Thomas P. Lemke et al., Mortgage-Backed Securities ("Lemke et al.") § 3:2 (2012), *available at* Westlaw MortSec ("Agency or 'conforming' mortgages are those that meet standards set by the GSEs and are therefore eligible for purchase by Fannie Mae or Freddie Mac. These standards usually include documentation requirements, debt-to-value limits and overall limits on the amount of the loan.").

*Nonagency mortgage-backed securities* vary widely, reflecting the diversity in the types of "nonagency" mortgages that are used as collateral for these securities. As explained below, nonagency mortgages include so-called "jumbo" mortgages, subprime mortgages, and "alt-A" mortgages. *See, e.g.*, Thomas Zimmerman, *Defining Nonagency MBS* ("Zimmerman"), *in* THE HANDBOOK OF MORTGAGE-BACKED SECURITIES 93 (Frank J. Fabozzi, ed., 6th ed. 2006); Lemke et al. § 3:4–3:7. Although each of these types of nonconforming mortgages fails to satisfy at least one GSE underwriting condition, they can also be quite distinct. *See generally* Zimmerman at 93–111 (explaining characteristics of nonagency mortgage-backed securities). Most importantly for present

---

[9] As securities issued by a federal agency, "Ginnie Mae securities . . . carry the full faith and credit of the United States." *Anchor Savings*, 81 Fed. Cl. at 16 n.12. "Fannie Mae and Freddie Mac, by contrast, . . . do not receive federal subsidies or appropriations," but securities that they issue nonetheless "bear the implicit backing of the federal government because they are backed by emergency drawing rights on the U.S. Treasury." *Id.*

purposes, these different types of nonagency mortgages often come with vastly different levels of prepayment risk and credit risk.[10]

*Jumbo mortgages*, which historically are the most common type of nonagency mortgage, *see Anchor Savings*, 81 Fed. Cl. at 18, are mortgages whose amounts exceed the maximum loan limits set by the Federal Housing Finance Agency[11] for agency-backed mortgages, *id.*, but that "have the same credit and documentation as agency loans," Zimmerman at 97; *see also* Lemke et al. § 3:4 ("[E]ven though not conforming, many jumbo mortgages may nonetheless be considered 'prime.' In other words, the credit quality for many jumbo mortgages is very high."). Because of their large size and the relative affluence of their borrowers, however, jumbo mortgages often pose a greater risk of prepayment than agency mortgages. *See* Zimmerman at 108; *see also* note 10, *ante* (explaining "prepayment risk").

*Subprime mortgages* became the most common type of loan in the nonagency mortgage-backed securities market about a decade ago. *See* Zimmerman at 94–95. There is no precise definition of subprime mortgages, but "the term generally refers to mortgages on loans to borrowers who have significantly higher credit risks" than prime borrowers. Lemke et al. § 3:5. Subprime mortgages therefore tend to come with a higher degree of credit and default risk than other mortgages, *see id.*,

---

[10] "Credit risk" (or "default risk") refers to the risk that a borrower will fail to make its debt payments. *See* Anand J. Bhattacharya et al., *An Overview of Mortgages and the Mortgage Market* ("Bhattacharya"), *in* THE HANDBOOK OF MORTGAGE-BACKED SECURITIES 30 (discussing credit and default risk). With respect to the invested principal, agency-backed mortgages pose little or no risk of default because a GSE effectively guarantees the principal payments. *Id.*; *see also* note 9, *ante*. "Prepayment risk" refers to the risk that the borrower will pay off the mortgage ahead of schedule, most commonly by selling the property or refinancing the loan at a lower interest rate, thus disrupting the lender's expected future cash flow. *See* Bhattacharya at 27.

[11] "The Federal Housing Finance Agency, or FHFA, was established in 2008 by the Housing and Economic Recovery Act ("HERA") to regulate Fannie Mae, Freddie Mac, and/or the Federal Home Loan Banks ("FHLBs")." *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 224 n.1 (2d Cir. 2012). Under HERA, the FHFA sets the loan limits for a "conforming mortgage," 12 U.S.C. § 4502(26) (defining "conforming mortgage"), using a housing price index that it prepares pursuant to 12 U.S.C. § 4542, *see id.* § 1717(b)(2) (defining loan limit applicable to Freddie Mac); *id.* § 1454(a)(2) (defining loan limit applicable to Fannie Mae and Ginnie Mae).

11

though the borrower's lesser ability to pay also comes with a lower risk of prepayment, *see* Zimmerman at 108.

*Alt-A mortgages* are also not susceptible to a single definition but "generally are larger in size than subprime loans and have significantly higher credit quality." Lemke et al. § 3.6.

## B. Applicable Law

### i.

"ERISA's central purpose is to protect beneficiaries of employee benefits plans." *In re Citigroup ERISA Litig.*, 662 F.3d 128, 135 (2d Cir. 2011) (internal quotation marks omitted). In pursuit of this goal, ERISA imposes a "prudent man standard of care" on fiduciaries entrusted with the administration of these plans. *See* 29 U.S.C. § 1104(a)(1).[12] The prudent-man standard generally requires fiduciaries to act "solely in the interest of the participants and beneficiaries." *Id.* It also specifically charges fiduciaries with four distinct, but interrelated duties.

First, fiduciaries must act "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries[ ] and defraying reasonable expenses of administering the plan." *Id.*

---

[12] Section 1104(a)(1) provides, in relevant part, as follows:

**(a) Prudent man standard of care**

    **(1)** Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

        **(A)** for the exclusive purpose of:

            **(i)** providing benefits to participants and their beneficiaries; and

            **(ii)** defraying reasonable expenses of administering the plan;

        **(B)** with the care, skill, prudence, and diligence *under the circumstances then prevailing* that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

        **(C)** by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

        **(D)** in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a)(1) (emphasis supplied).

§ 1104(a)(1)(A). Second, fiduciaries must use "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B). Third, fiduciaries must "diversify[ ] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." *Id.* § 1104(a)(1)(C). Fourth, fiduciaries are required to discharge their duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [other provisions of ERISA]." *Id.* § 1104(a)(1)(D). Saint Vincent's alleges that Morgan Stanley breached the last three of these obligations.[13]

The duty of prudence mandated by § 1104(a)(1)(B) "is measured according to the objective prudent person standard developed in the common law of trusts." *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quotation marks omitted). Under that common-law standard, and consistent with ERISA's instruction that fiduciaries act in a prudent manner "under the circumstances then prevailing," 29 U.S.C. § 1104(a)(1)(B), "[w]e judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight," *In re Citigroup*, 662 F.3d at 140 (internal quotation marks omitted). Accordingly, "[w]e cannot rely, after the fact, on the magnitude of the decrease in the [relevant investment's] price; rather, we must consider the extent to which plan fiduciaries at a given point in time reasonably could have predicted the outcome that followed." *Id.* In other words, as the Court of Appeals for the Third Circuit has nicely summarized, this standard "focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate

---

[13] In the District Court, Saint Vincent's also argued that Morgan Stanley breached its duty of loyalty under § 1103(a)(1)(A), but it has abandoned that argument on appeal. *See, e.g., Cruz v. Gomez*, 202 F.3d 593, 596 n.3 (2d Cir. 2000) ("When a litigant . . . raises an issue before the district court but does not raise it on appeal, the issue is abandoned.").

methods to investigate and determine the merits of a particular investment." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996). In short, ERISA's "fiduciary duty of care . . . requires prudence, not prescience." *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) (internal quotation marks omitted).

Pursuant to ERISA implementing regulations, promulgated by the Secretary of Labor, a fiduciary's compliance with the prudent-man standard requires that the fiduciary give "appropriate consideration" to whether an investment "is reasonably designed, as part of the portfolio . . . to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment." 29 C.F.R. § 2550.404a-1(b)(2)(i).[14] Accordingly, the prudence of each investment is not assessed in isolation but, rather, as the investment relates to the portfolio as a whole. *See Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1043 (9th Cir. 2001); *Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*, 173 F.3d 313, 322 (5th Cir. 1999). An ERISA fiduciary's investment decisions also must account for changed circumstances, and "[a] trustee who simply ignores changed

---

[14] Pursuant to 29 C.F.R. § 2550.404a-1(b)(1)(i), the requirements of 29 U.S.C. § 1104(a)(1)(B) are satisfied if the fiduciary:

> (i) Has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and
>
> (ii) Has acted accordingly.

The regulations then provide, in relevant part, that

> "appropriate consideration" shall include, but is not necessarily limited to, . . . [a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action . . . .

29 C.F.R. § 2550.404a-1(b)(2)(i).

circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent."
*Armstrong v. LaSalle Bank Nat'l Assoc.*, 446 F.3d 728, 734 (7th Cir. 2006).

In the same way, the "duty to diversify is not measured by hard and fast rules or formulas." *In re Unisys*, 74 F.3d at 438. Instead, "a prudent fiduciary must consider the facts and circumstances of each case." *Id.* (quoting H.R. REP. NO. 93-1280, at 304, *reprinted in* 1974 U.S.C.C.A.N. 5038, 5084). In deciding whether the diversification requirement was breached, "[t]he factors to be considered include (1) the purposes of the plan; (2) the amount of plan assets; (3) financial and industrial conditions; (4) the type of investment . . . ; (5) distribution as to geographic[al] location; (6) distribution as to industries; [and] (7) the dates of maturity." *Id.* (quoting the same).

**ii.**

As an appeal from a dismissal of the complaint under Rule 12(b)(6), this case requires us to apply the pleading standards articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), to the claim of a breach of fiduciary duties under ERISA. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). As the Supreme Court has explained, this standard creates a "two-pronged approach," *id.* at 679, based on "[t]wo working principles," *id.* at 678.

First, although a complaint need not include detailed factual allegations, it must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual

15

allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* This "facial plausibility" prong requires the plaintiff to plead facts "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Importantly, the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

As we will see, the nature of Saint Vincent's allegations under ERISA calls for particular care in applying this two-pronged inquiry in order to ensure that the Amended Complaint alleges *nonconclusory* factual content raising a *plausible* inference of misconduct and does not rely on "the vantage point of hindsight." *In re Citigroup*, 662 F.3d at 140 (internal quotation marks omitted).

The key issue in this suit is whether Morgan Stanley acted prudently, both with respect to the particular investments at issue, and with respect to the diversification of Portfolio assets. As the District Court correctly observed, however, the Amended Complaint contains no factual allegations referring *directly* to Morgan Stanley's knowledge, methods, or investigations at the relevant times. *See Saint Vincent's*, 2010 WL 4007224, at *4. By itself, this omission is not fatal to a claim alleging a breach of fiduciary duty. Even when the alleged facts do not "directly address[ ] the process by which the Plan was managed," a claim alleging a breach of fiduciary duty may still survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably "infer from what

16

is alleged that the process was flawed." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009). Indeed, "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Id.* at 598.

Accordingly, a claim for a breach of fiduciary duty under ERISA may survive a motion to dismiss—even absent any well-pleaded factual allegations relating directly to the methods employed by the ERISA fiduciary—if the complaint "allege[s] facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *In re Citigroup*, 662 F.3d at 141 (internal quotation marks omitted). Under this objective standard, whether an ERISA fiduciary's investment decision is improvident depends on what a prudent man in like circumstances would do. *See Knight v. C.I.R.*, 552 U.S. 181, 193 (2008) (discussing the genesis of the prudent-man standard). Critically, however, plaintiffs "cannot rely, after the fact, on the magnitude of the decrease in the [relevant investment's] price." *In re Citigroup*, 662 F.3d at 140. Nor is it necessarily sufficient to show that better investment opportunities were available at the time of the relevant decisions. *See Braden*, 588 F.3d at 596 n.7 ("It is clear that 'nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund.'" (quoting *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009))).

Rather, if the complaint relies on circumstantial factual allegations to show a breach of fiduciary duties under ERISA, those allegations must give rise to a "*reasonable* inference" that the defendant committed the alleged misconduct, *Iqbal*, 556 U.S. at 678 (emphasis supplied), thus "permit[ting] the court to infer more than the *mere possibility* of misconduct," *id.* at 679 (emphasis supplied). As we recently explained, "courts may draw a reasonable inference of liability when the facts alleged are suggestive of, rather than merely consistent with, a finding of misconduct." *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, --- F.3d ----, No. 12-1707-cv, 2013 WL 765178, at *9 (2d Cir. Mar. 1, 2013). The application of this "plausibility" standard to particular

cases is "'context-specific,'" *id.* at *10 n.7 (quoting *Iqbal*, 556 U.S. at 679), and requires assessing "the allegations of the complaint as a whole," *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323 (2011). For instance, the complaint may allege facts sufficient to raise a plausible inference that the investments at issue were so plainly risky at the relevant times that an adequate investigation would have revealed their imprudence, or that a superior alternative investment was readily apparent such that an adequate investigation would have uncovered that alternative.

This understanding of the relevant pleading requirements is consistent with the basic purposes of both ERISA and Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure. As the Supreme Court has noted, "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79. Indeed, the prospect of discovery in a suit claiming breach of fiduciary duty is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests about its methods and knowledge at the relevant times. This burden, though sometimes appropriate, elevates the possibility that "a plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (alteration and internal quotation marks omitted). As the Court of Appeals for the Seventh Circuit has observed, Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure, as interpreted in *Twombly* and *Iqbal*, help "to prevent settlement extortion—using discovery to impose asymmetric costs on defendants in order to force a settlement advantageous to the plaintiff regardless of the merits of his suit." *Am. Bank v. City of Menasha*, 627 F.3d 261, 266 (7th Cir. 2010); *see also, e.g.*, *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) ("[T]he price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate

18

concrete enough to warrant further proceedings, which may be costly and burdensome. Conclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition.").

On the other hand, an ERISA plan participant, beneficiary, or fiduciary with a meritorious claim will still be able to allege facts plausibly showing that an ERISA fiduciary should have been aware that the relevant investment decisions did not satisfy ERISA's fiduciary standards. Although details about a fiduciary's methods and actual knowledge tend to be "in the sole possession of [that fiduciary],"[15] *Braden*, 588 F.3d at 598, ERISA imposes extensive disclosure requirements on plan administrators, thus giving plan beneficiaries (*i.e.*, prospective plaintiffs) the opportunity to find out how the fiduciary invested the plan's assets. For instance, ERISA requires plan administrators to prepare annual reports, which must include "a statement of assets and liabilities, and a statement of changes in net assets available for plan benefits which shall include details of revenues and expenses and other changes aggregated by general source and application." 29 U.S.C. § 1023(b)(2). This financial statement must further disclose "a statement of the assets and liabilities of the plan aggregated by categories and valued at their current value, and the same data displayed in comparative form for the end of the previous fiscal year of the plan," *id.* § 1023(b)(3)(A), as well as "a schedule of all assets held for investment purposes aggregated and identified by issuer, borrower, or lessor, or similar party to the transaction . . . , maturity date, rate of interest, collateral, par or maturity value, cost, and current value," *id.* § 1023(b)(3)(C). If the plan puts some of its funds in a "common or collective trust," the annual report must include "the most recent annual statement of assets and liabilities of such common or collective trust, and in the case of a separate account or a

---

[15] Although Saint Vincent's—the plaintiff—was the plan administrator, the complaint does not disclose any knowledge of Morgan Stanley's operations as an investment manager. Under ERISA, a plan administrator is generally not "under an obligation to invest or otherwise manage any asset of the plan which is subject to the management" of an "investment manager" appointed under § 1102(c)(3). *See* 29 U.S.C. § 1105(d)(1).

separate trust, such other information as is required by the administrator in order to comply with this subsection." *Id.* § 1023(b)(3)(G). Finally, ERISA requires plan administrators to disclose this information to plan participants and beneficiaries. *See, e.g., id.* § 1021(a);[16] *id.* § 1021(f);[17] *id.* § 1024(b).[18] And a plaintiff's access to this information is even more apparent where, as here, the plaintiff is the plan administrator responsible for issuing these statutorily required disclosures and statements.

Armed with this extensive data about a fiduciary's investment decisions, a prospective plaintiff must show, through reasonable inferences from well-pleaded facts, that the fiduciary's choices did not meet ERISA's requirements. As noted, for a plaintiff relying on inferences from circumstantial allegations, this standard generally requires the plaintiff to allege facts, accepted as true, showing that a prudent fiduciary in like circumstances would have acted differently. We now review *de novo* whether the Amended Complaint satisfies this standard. *See In re Citigroup*, 662 F.3d at 135.

### C. Analysis

#### i.

We begin with Saint Vincent's argument that Morgan Stanley failed to use "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like

---

[16] In relevant part, 29 U.S.C. § 1021(a) provides that plan administrators must "cause to be furnished in accordance with section 1024(b) of this title to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan . . . (2) the information described in subsection (f) and sections 1024(b)(3) and 1025(a) and (c) of this title."

[17] With respect to defined-benefit plans, ERISA provides that the administrator must provide a "plan funding notice . . . to each plan participant and beneficiary," 29 U.S.C. § 1021(f)(1), and that such notice "shall include" notice that the participant or beneficiary "may obtain a copy of the annual report of the plan filed under section 1024(a) of this title upon request, through the Internet website of the Department of Labor, or through an Intranet website maintained by the applicable plan sponsor (or plan administrator on behalf of the plan sponsor)," *id.* § 1021(f)(2)(B)(ix).

[18] Under 29 U.S.C. § 1024(b)(4), for example, "[t]he administrator shall, upon written request of any participant or beneficiary, furnish a copy of the . . . latest annual report."

capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Saint Vincent's alleges that Morgan Stanley "exposed the Plan to excessive risk due to an egregious over-concentration in high-risk mortgage securities," Am. Compl. ¶ 60, and "failed to monitor the Plan's investments to protect the Plan from economic harm," *id.* ¶ 61. However, the facts alleged in the Amended Complaint fail to give rise to a reasonable inference that Morgan Stanley's investment decisions were imprudent at the relevant times.

The Amended Complaint refers to "warning signs" that should have caused Morgan Stanley to reduce its exposure to these securities. Specifically, the Amended Complaint alleges that: (1) several of the issuers of mortgage-backed securities held in the Plan—IndyMac, Bear Stearns, Washington Mutual, and Countrywide—disclosed large losses during 2007 and 2008 owing to their own exposure to subprime mortgage-backed securities; (2) analysts predicted in 2007 that Morgan Stanley's parent company would have to write down $6 billion on the value of its subprime mortgage-backed securities; and (3) in December 2007, Standard & Poor's reduced its ratings on about $7 billion of Alt-A mortgage-backed securities, which are usually considered less risky than subprime mortgage-backed securities. None of these alleged "warning signs," however, gives rise to a plausible inference that Morgan Stanley knew, or should have known, that the securities in the Portfolio were imprudent investments, or that Morgan Stanley breached its fiduciary duty by not selling those investments at whatever unspecified prices existed during the unspecified period in which it was imprudent to maintain those unspecified investments.

For instance, Saint Vincent's alleges that the Portfolio contained an unspecified amount of subprime mortgage-backed securities issued by IndyMac, Bear Stearns, Washington Mutual, and Countrywide, and that three of these entities suffered substantial losses in 2007. Even if it is reasonable to infer that Morgan Stanley's investments performed in line with the losses sustained by

21

these issuers, the Amended Complaint still fails to allege facts plausibly showing that Morgan Stanley should have acted differently because the decline in the price of a security does not, by itself, give rise to a plausible inference that the security is no longer a good investment. *See, e.g.*, *Gearren v. The McGraw-Hill Cos.*, 660 F.3d 605, 610 (2d Cir. 2011) (an investment in company stock is not imprudent "'mere[ly]'" because the price "'trend[s] downward significantly'" (quoting *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004))). Rather, the allegation of a decline in price indicates only that the security *turns out to have been*, *in hindsight*, a bad investment. As we have explained, an allegation that an investment's price dropped, even precipitously, does not alone suffice to state a claim under ERISA. *See In re Citigroup*, 662 F.3d at 140; *see also Summers v. State St. Bank & Trust Co.*, 453 F.3d 404, 408 (7th Cir. 2006).

Of course, in some cases, it would be reasonable to infer from a decline in the price of a security, *combined with other alleged facts*, that the security no longer was a sound investment. *In re Citigroup*, 662 F.3d at 141. The most glaring problem with St. Vincent's allegations, however, is that the Amended Complaint does not allege *any* such surrounding circumstances that might make this inference plausible, and fails to connect the alleged "warning signs" to any specific characteristics of the securities in the Portfolio.

For instance, Saint Vincent's alleged that around July 2007, "Bear Stearns announced that investments backed by risky mortgages had left two of its hedge funds virtually worthless." Am. Compl. ¶ 40. Even if we inferred that the same were true of the Portfolio's unspecified amount of unspecified subprime mortgage-backed securities, *see id.* ¶ 36, we fail to see how this inference would plausibly give rise to a second inference that Morgan Stanley violated its fiduciary duty by not selling "virtually worthless" investments. Perhaps selling the "virtually worthless" investments would have

22

been *imprudent* because short-term investors may have caused the market to overcompensate for the risk of default. The complaint alleges no facts suggesting one conclusion or the other.[19]

To be sure, a rapid decline in the price of a security would likely lead a prudent fiduciary to *investigate* whether it was still prudent to hold that investment. But the Amended Complaint does not allege that Morgan Stanley failed to conduct such an inquiry, nor does the decline in price necessarily give rise to that inference. *See, e.g.*, *In re Citigroup*, 662 F.3d at 140 (plaintiffs "cannot rely, after the fact, on the magnitude of the decrease" in value to show inadequate investigation); *Quan v. Computer Scis. Corp.*, 623 F.3d 870, 884 (9th Cir. 2010) ("[T]he district court properly found that the decline in CSC's stock price did not give rise to an inference that the Fiduciaries did not properly investigate the merits of continued investment in CSC stock."). Moreover, even if we assume that a sudden decrease in value of mortgage-backed securities tends to show an increased risk of default in the underlying assets, that suggestion of added risk, as we have just explained, does not give rise to a reasonable inference that those investments were imprudent to maintain and therefore should have been sold at the much-reduced price. Importantly, the Amended Complaint offers no insight into how risky those unspecified investments became relative to their price, nor does it allege any facts suggesting that a prudent investor at the time would have viewed this unspecified risk as high enough to render the investments imprudent.[20]

For these reasons, Saint Vincent's bare allegations with respect to Morgan Stanley's investments in subprime mortgage-backed securities do not give rise to a plausible inference that

---

[19] We have recently explained that "a reasonable inference need not be 'as compelling as any opposing inference' one might draw from the same factual allegation." *N.J. Carpenters Health Fund*, 2013 WL 765178, at *9 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)). Nonetheless, the factual allegations still must be specific enough to suggest liability. *Id.*

[20] For instance, the Amended Complaint does not allege that the ratings of the relevant securities fell below the ratings-agency benchmarks established by plan documents, *see* Part C.iii., *post*, nor does it allege facts plausibly showing that the securities were improvidently risky according to some other metric or method used by prudent investors at the time.

Morgan Stanley acted imprudently. The Amended Complaint only alleges large declines in the overall subprime market during 2007 and 2008. These price decreases do not, without further factual allegations, plausibly show that Morgan Stanley's unspecified subprime investments were imprudent in "the circumstances then prevailing," or that a prudent inquiry would have uncovered that risk. 29 U.S.C. § 1104(a)(1)(B).

Similarly, the Amended Complaint fails to connect its allegation that Standard & Poor's downgraded the credit ratings on $7 billion worth of Alt-A mortgages to its conclusion that Morgan Stanley breached its fiduciary duties. For instance, Saint Vincent's does not allege that Standard & Poor's "downgraded" any of the securities held in the Portfolio. Nor does the Amended Complaint allege that any such downgrade made those securities imprudent in light of the other investments in the Portfolio, or that this downgrade led to a violation of the requirement in the Plan Guidelines that the fixed-income portfolio maintain an average credit rating of AA or higher. *See* Investment Policy Statement ("Guidelines"),[21] Joint App'x at 48.

As noted, such imprecise pleading is particularly inappropriate here, where the plaintiffs necessarily have access, without discovery, to plan documents and reports that provide specific information from which to fashion a suitable complaint. *Cf., e.g.*, *Renfro v. Unisys Corp.*, 671 F.3d 314, 327 (3d Cir. 2011) ("[T]he range of investment options and the characteristics of those included options—including the risk profiles, investment strategies, and associated fees—are highly relevant and readily ascertainable facts against which the plausibility of claims challenging the overall composition of a plan's mix and range of investment options should be measured.").[22] Rather than

---

[21] Because Saint Vincent's relied heavily upon, and quoted from, portions of the Guidelines in its Amended Complaint, we are permitted to refer to other provisions of the Guidelines in evaluating Saint Vincent's claims. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).

[22] For this reason, our holding is not in tension with our decision in *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011). In *Litwin*—an action under Sections 11 and 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2), and regulations thereunder—we addressed an alleged violation of Item 303 of SEC Regulation S-K, 17 C.F.R.

24

alleging any factual matter about how a prudent investor would have viewed the Portfolio's securities at the relevant times, and in the relevant circumstances, the Amended Complaint simply ignores the issue.

In sum, viewing the allegations in the Amended Complaint as a whole, and drawing every reasonable inference in favor of Saint Vincent's, the Amended Complaint does not allege facts plausibly showing that Morgan Stanley knew, or should have known, at the relevant times, that the securities held in the fixed-income Portfolio were imprudent investments. Instead, the Amended Complaint alleges imprudence by association, reasoning that because the Portfolio contained nonagency mortgage-backed securities—of which subprime mortgage-backed securities are now the most infamous type—and because the whole world knows (in hindsight) that many subprime mortgages turned out to be disastrous investments, the Portfolio's concentration in mortgage-backed securities generally and nonagency securities in particular was imprudent. The relevant pleading standards do not permit such general accusations of imprudence, unsupported by well-pleaded factual allegations.

**ii.**

Saint Vincent's also alleges that, even if particular investments were not imprudent, Morgan Stanley "failed to properly diversify the fixed income portfolio, achieving a disproportionate exposure to the risk of the mortgage securities markets." Am. Compl. ¶ 32. As noted, *see* Part B.i., *ante*, ERISA requires a plan fiduciary to "diversify[ ] the investments of the plan so as to minimize

---

§ 229.303(a)(3)(ii), which requires a registrant to "[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." We held that the plaintiffs need not identify specific at-risk investments or assets in Blackstone's real estate fund because such a requirement "misses the very core of plaintiffs' allegations, namely, that Blackstone omitted material information that it had a duty to report." *Litwin*, 634 F.3d at 721. This case, in contrast, involves a duty of prudence rather than a duty to disclose. Moreover, Saint Vincent's had access to plan documents putting it in a position to plead facts with greater particularity without formal discovery. *Contra id.* ("Plaintiffs allege that they were unaware of, but legally entitled to disclosure of, the very information that the District Court held had to be specified in plaintiffs' complaint.").

the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C).

Saint Vincent's does not support its diversification claim with factual allegations sufficient to elevate it from the realm of mere "legal conclusions." *Iqbal*, 556 U.S. at 679. Saint Vincent's repeatedly stresses that Morgan Stanley "over-concentrat[ed] the fixed-income portfolio in high-risk, mortgage securities." Am. Compl. ¶ 1; *see also, e.g.*, *id.* ¶¶ 23, 26, 60. However, the only related *facts* alleged in the Amended Complaint are the following: (1) "in the fourth quarter of 2007, 12.6% of the Plan's fixed-income portfolio was invested in non-agency mortgage securities, and in each of the four quarters of 2008, that percentage concentration exceeded 9%," *id.* ¶ 23; and (2) "[s]imilarly, in each of those same quarters, the Plan's overall exposure to mortgage securities in its fixed-income portfolio generally exceeded that of the Citigroup BIG by approximately 10%," *id.* ¶ 24.

With respect to the first allegation, that 12.6% of the Portfolio was concentrated in nonagency mortgage-backed securities in late 2007—a percentage that apparently dropped in 2008—we agree with the District Court that this allegation is insufficient to raise a plausible inference that Morgan Stanley breached its duty to diversify the Portfolio. *See Saint Vincent's*, 2010 WL 4007224, at *5–6. Plaintiffs have alleged no additional facts that would permit us to determine whether a 12.6% concentration in nonagency securities in the fixed-income Portfolio—which itself comprised only about 35% of the Plan's total assets, *see* Joint App'x at 52—reflected an improperly non-diverse portfolio, *see* 29 U.S.C. § 1104(a)(1)(C). Especially in light of the substantial diversity of securities included under the subheading of "nonagency" securities, *see* Part A, *ante*, we conclude that this particular allegation—by itself, and in combination with the other alleged facts, sparse as they are—is insufficient to plausibly show that Morgan Stanley breached its duty to diversify the Portfolio.

With respect to Saint Vincent's allegation that the Portfolio's share of mortgage-backed securities "generally exceeded that of the Citigroup BIG by approximately 10%," *id.* ¶ 24, we agree with the District Court that this allegation is unenlightening without facts indicating the extent of the concentration of mortgage-backed securities in the benchmark index, and without any facts suggesting "whether and how this 10% variance from the Index is material to the Fund's diversification," *Saint Vincent's*, 2010 WL 4007224, at *5. For instance, a 10% variance, as we understand Saint Vincent's use of that term, could be the difference between 10% and 20%, or it could be the difference between 90% and 100%.[23] Knowing those figures would be an obvious, if not essential, starting point for assessing the plausibility of a diversification claim. Moreover, as we have observed, *see* Part A, *ante*, "mortgage-backed securities" is a broad category, diverse in the degree of risk and reward in the various financial instruments that fall within that category. Yet the Amended Complaint does not even assert, much less plausibly show with factual allegations, that the share of mortgage-backed securities in the Citigroup BIG reflects an upper limit on the percentage of mortgage-backed securities that can be held by a properly diversified ERISA plan whose focus is long-term growth.

Finally, we reject Saint Vincent's argument that the Amended Complaint plausibly alleges a failure to diversify based on the allegation that Morgan Stanley "invest[ed] more than 60% of the Plan's fixed-income assets in a single, propriety fund of [Morgan Stanley]." Am. Compl. ¶ 25. As the District Court explained, "this unidentified 'proprietary fund' is not itself alleged to be the basis

---

[23] On appeal, Saint Vincent's argues, for the first time, that it has alleged a viable failure-to-diversify claim because a document submitted for the first time by Morgan Stanley in its motion to dismiss shows that, as of December 31, 2008, the Portfolio contained a 49.6% concentration in mortgages, while the benchmark index contained a 38.9% concentration. *See* Joint App'x at 152. This new information, which was not relied on by the District Court, is not relevant to this appeal, which asks whether *the complaint* presents sufficient allegations to survive a motion to dismiss. *See Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 63 n. 4 (2d Cir. 2012) (explaining why, as a general matter, materials outside the pleadings and not incorporated by reference are not properly within the scope of a court's review of a motion to dismiss under Rule 12). Under the circumstances, "we see no reason to allow [Saint Vincent's] to effectively amend [its] complaint on appeal." *Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 117 (2d Cir. 2009).

for the Fund's losses or its inadequately diverse portfolio, nor is there any allegation that the single, proprietary fund was not, itself, diversified." *Saint Vincent's*, 2010 WL 4007224, at \*5. "Rather, it is the overall percentage of fixed income holdings in mortgage securities that form[s] the basis for the lack of diversification claim." *Id.* Accordingly, this allegation—individually and in combination with the other alleged facts—does not give rise to a plausible inference that Morgan Stanley failed to diversify the Portfolio's investments.

### iii.

Nor does the Amended Complaint allege facts plausibly showing that Morgan Stanley violated its duty to act "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). Saint Vincent's alleges that Morgan Stanley breached this duty by deviating from the written investment Guidelines, which "specified that the 'primary investment objective for the Pension Plan shall be preservation of principal with emphasis on long-term growth to meet the future retirement liability of the Plan.'" Am. Compl. ¶ 20. The Amended Complaint, however, does not contain factual allegations showing, even circumstantially, that Morgan Stanley failed to pursue this long-term growth objective—or that it pursued some other objective—even if its investment efforts were unsuccessful.

Indeed, the Guidelines include thirteen specific "investment manager restrictions," which Morgan Stanley had to follow "unless written approval [was] received from the St. Vincent's Hospital Investment Committee." Joint App'x at 53. The Amended Complaint does not allege that Morgan Stanley violated any of these restrictions. Combined with the Amended Complaint's failure to show that Morgan Stanley should have known that its investments were improvident, the absence of any allegation that Morgan Stanley breached any specific Guidelines restrictions is striking. These restrictions are detailed. For instance, the eighth restriction provides:

> Any investment manager's fixed income portfolio must have a weighted average credit rating of AA or better by Standard & Poor's or Aa or better by Moody's

28

(together, the "Rating Services"). Bonds purchased must have a credit rating of investment grade or better by the Rating Services, except that a maximum of 10% of the market value of the portfolio may be invested in bonds rated below BBB- or Baa3 as long as all such bonds also have and maintain a minimum rating of B/Ba or BB/B or better by the Rating Services.

*Id.* at 48. Saint Vincent's has not alleged any facts showing, even circumstantially, that Morgan Stanley ignored general Plan goals, nor has it alleged any facts that would give rise to a reasonable inference that Morgan Stanley violated the specific Guidelines terms designed to implement those goals.

We also reject Saint Vincent's argument that Morgan Stanley failed to act in accordance with the Guidelines provision setting the Citigroup BIG as the benchmark for the Portfolio's performance. *See* Am. Compl. ¶ 21. According to the Amended Complaint, Morgan Stanley "took on risk for the Plan well in excess of the risk inherent in the designated [Citigroup BIG] bond index." *Id.* ¶ 31. However, as the District Court well noted, "the Complaint does not allege that Morgan Stanley was required to replicate the investments of the Index." *Saint Vincent's*, 2010 WL 4007224, at *4. On the contrary, the Guidelines explicitly state that "[t]he total return is expected to *exceed* the total return of a balanced index" based, in part, on the Citigroup BIG. Joint App'x at 50 (emphasis supplied). In doing so, the Guidelines explicitly anticipate *different* investments than those represented in the Citigroup BIG, and the expectation of higher returns seems to anticipate the possibility of riskier investment decisions. Additionally, the allegation that Morgan Stanley's investments created risk "well in excess" of the risk inherent in the benchmark is a conclusory assertion, unsupported by any factual allegation other than the Amended Complaint's comparison of mortgage-backed securities in the Portfolio and in the Citigroup BIG, which we have already addressed. *See* Part C.ii, *ante*.

In sum, the Amended Complaint fails to allege facts to support a plausible inference that Morgan Stanley did not comply with Plan documents.

29

## D. State Law Claims

After dismissing these ERISA claims pursuant to Rule 12(b)(6), the District Court declined, pursuant to 28 U.S.C. § 1367(c),[24] to exercise supplemental jurisdiction over QIL's attendant state-law claims. *See Saint Vincent's*, 2010 WL 4007224, at *6–7. It is a truism of federal civil procedure that "[i]n providing that a district court 'may' decline to exercise such jurisdiction, [§ 1367(c)] is permissive rather than mandatory." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003). We therefore review the District Court's decision to decline to exercise supplemental jurisdiction for abuse of discretion. *Id.*; *see also In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (noting that a district court abuses its discretion if it "base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or render[s] a decision that cannot be located within the range of permissible decisions" (internal citation and quotation marks omitted)). It is well to recall that "'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Valencia ex rel. Franco*, 316 F.3d at 306 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

We conclude that the District Court, consistent with its careful and well-reasoned analysis elsewhere in its decision, did not err, much less "abuse" its discretion, by declining to exercise supplemental jurisdiction over the remaining state-law claims. Indeed, Saint Vincent's argues only that the state-law claims should be reinstated if we reverse the District Court's judgment with respect to the federal claims. *See* Appellants' Br. at 33. Consequently, we affirm the dismissal of the state-law claims.

---

[24] Section 1367(c) provides, in relevant part, that "district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

**CONCLUSION**

To summarize, we hold:

1. A complaint alleging a breach of fiduciary duties under ERISA may survive a motion to dismiss based solely on circumstantial factual allegations—that is, absent any well-pleaded factual allegations relating directly to the methods employed by the ERISA fiduciary to investigate, select, and monitor investments—only when those allegations give rise to a "*reasonable* inference" that the defendant committed the alleged misconduct, *Iqbal*, 556 U.S. at 678 (emphasis supplied), thus "permit[ting] the court to infer more than the *mere possibility* of misconduct," *id.* at 679 (emphasis supplied).

2. Whether a particular complaint satisfies this standard is "context-specific." *Id.* For a plaintiff alleging a breach of fiduciary duty under ERISA, this standard generally requires the plaintiff to allege facts that, if accepted as true, would show that a prudent fiduciary in like circumstances would have acted differently.

3. A plaintiff cannot solely "rely, after the fact, on the magnitude of the decrease in the [portfolio's value]," *In re Citigroup*, 662 F.3d at 140, to show that the ERISA fiduciary's investments were imprudent before, during, or after the decline in value. In other words, a decline in a security's market price does not, by itself, give rise to a reasonable inference that holding that security was or is imprudent.

4. Applying these standards to the present case, we hold that the District Court properly dismissed Saint Vincent's claim of a breach of fiduciary duty under ERISA. In particular, the allegations in the Amended Complaint do not, individually or in combination, give rise to a reasonable inference that (1) Morgan Stanley's investment decisions with respect to the fixed-income Portfolio were imprudent given the circumstances prevailing at the time of

31

those decisions; (2) Morgan Stanley did not properly diversify the fixed-income Portfolio; or (3) Morgan Stanley failed to act in accordance with Plan documents.

5. The District Court also did not err, must less "abuse" its discretion, by declining to exercise supplemental jurisdiction over the remaining state-law claims.

For these reasons, the judgment of the District Court is **AFFIRMED**.

STRAUB, *Circuit Judge*, dissenting in part:

In enacting the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, Congress sought to ensure "the continued well-being and security of millions of employees and their dependents" by regulating employee benefit plans. *See id.* § 1001(a). To achieve this goal, Congress required the fiduciaries of ERISA benefit plans to act in accordance with stringent standards of conduct. *See id.* § 1001(b). "The fiduciary obligations of the trustees to the participants and beneficiaries of [an ERISA] plan are those of trustees of an express trust – the highest known to the law." *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (alterations in original) (quoting *Donovan v. Bierwitz*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (Friendly, J.)).

Such standards are enforced in part by private litigation. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 n.8 (8th Cir. 2009) (citing 29 U.S.C. § 1136(b)). Accordingly, the Secretary of Labor ("Secretary"), charged with administering ERISA, "has expressed concern over the erection of unnecessarily high pleading standards in ERISA cases." *Id.* (internal quotations omitted). In the Secretary's view, heightened pleading requirements threaten to obstruct ERISA's remedial goals. *See id.*

Against the backdrop of strong statutory protections and the Secretary's judgment that "unnecessarily high pleading standards" should not be permitted to render such protections moot, the majority in effect embraces a heightened pleading standard which threatens to do exactly that. ERISA should not be gutted by the judicial imposition of a pleading standard with no basis in law. While I agree with the majority that the District Court was correct to dismiss Plaintiffs' claims for breach of the fiduciary duty to diversify and breach of the duty to act in accordance with the documents and instruments governing the Plan, I would find that Plaintiffs have

-1-

adequately stated a claim for a breach of the fiduciary duty of prudence. Accordingly, I respectfully dissent in part.

**BACKGROUND**

Plaintiffs in this action claim that their investment manager, Morgan Stanley Investment Management ("MSIM")[1], violated ERISA by failing to manage the fixed-income portfolio of the investment Plan at issue with the ERISA-mandated standard of care, skill, prudence and diligence ("Prudence Claim").

According to Plaintiffs, they instructed MSIM to carry out a low-risk investment strategy with respect to their Plan assets. Specifically, Plaintiffs allegedly promulgated written investment guidelines, which specified that the Plan's "primary investment objective" was the "preservation of principal with emphasis on long-term growth." Am. Compl. ¶ 20. In addition, Plaintiffs designated as a performance benchmark what is now known as the Citigroup Broad Investment Grade Index ("Citigroup BIG"). *Id.* ¶ 21. Plaintiffs claim that "the selection of the Citigroup BIG index as a benchmark signaled to MSIM that, as an ERISA fiduciary, it was required to execute a low-risk, conservative investment strategy." *Id.*

MSIM allegedly departed from the foregoing, conservative investment strategy by placing large amounts of the Portfolio's assets into high-risk investments. For example, MSIM allegedly invested between 9% and 12.6% of the Portfolio in "non-agency mortgage securities" during the relevant time period. *Id.* ¶ 23. Such securities failed to meet the underwriting standards of Fannie Mae and Freddie Mac, and thus were not guaranteed. *Id.* ¶ 22 n.2. By contrast, the Citigroup BIG had no exposure to non-agency mortgage securities. *Id.* ¶ 23.

---

[1] While the majority refers to Defendant as "Morgan Stanley", I use the term MSIM so as to distinguish the investment advisor branch of Morgan Stanley from its parent company.

According to Plaintiffs, these and other investments "directly exposed the Plan to the volatility of the subprime mortgage market," at precisely the time borrower defaults "were skyrocketing and numerous subprime lenders were facing insolvency." *Id.* ¶ 29. Plaintiffs claim that MSIM "continued to maintain the fixed-income portfolio's allocation to . . . mortgage securities" "[e]ven as . . . many . . . problems in the mortgage-backed securities market came to light." *Id.* ¶ 43. For example, MSIM invested Plan assets in mortgage securities issued by IndyMac Bank, Bear Stearns, Washington Mutual, and Countrywide, each of which suffered severe losses due to mortgage failures. *Id.* ¶¶ 31, 36-41. Plaintiffs claim that damages resulting from imprudent investment of the Plan's assets during the relevant time period exceed $25 million. *Id.* ¶ 27.

The District Court concluded that Plaintiffs' Amended Complaint did not sufficiently allege MSIM's imprudent management of the Plan. It found that the Amended Complaint lacked allegations that MSIM inadequately investigated the merits of its investments, and instead focused on "the poor results of the investments." (JA 218.)

**DISCUSSION**

*I.* *Applicable Law and Standard of Review*

We test the sufficiency of a complaint by a familiar standard. But in affirming the dismissal of Plaintiffs' Prudence Claim, the majority here effectively – and contrary to authority – deviates from it. To show why this is so, I briefly review what the Supreme Court has prescribed as the minimum required in order to state a claim upon which relief can be granted.

Rule 8 of the Federal Rules of Civil Procedure provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ.

P. 8(a)(2).  To meet this standard, and thus survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  The plausibility standard is not a "probability requirement."  *Id*.  "[I]t simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting a plaintiff's claim for relief.  *See Twombly*, 550 U.S. at 556.  A complaint thus need not contain "detailed factual allegations," *see Iqbal*, 556 U.S. at 678; indeed, we have rejected the "contention that *Twombly* and *Iqbal* require the pleading of specific evidence or extra facts beyond what is needed to make [a] claim plausible."  *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120-21 (2d Cir. 2010).  "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'"  *Braden*, 588 F.3d at 594 (quoting *Iqbal*, 556 U.S. at 678).  Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotations omitted).  This is so because, as the majority itself notes, "a reasonable inference need not be 'as compelling as any opposing inference' one might draw from the same factual allegation."  Maj. Op. at 23 n.20 (quoting *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, --- F.3d ----, No. 12-1707-cv, 2013 WL 765178, at *9 (2d Cir. Mar.1, 2013).

We review *de novo* the dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff. *Caro v. Weintraub*, 618 F.3d 94, 97 (2d Cir. 2010).

## II. Plaintiffs' Prudence Claim Is Adequately Stated

### A. Applicable Law

To state a claim for breach of fiduciary duty under ERISA, a plaintiff must allege facts which, if true, would show that the defendant acted as a fiduciary, breached its fiduciary duty, and thereby caused a loss to the plan at issue. 29 U.S.C. § 1109(a); *Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000). The only element at issue here is whether MSIM breached its fiduciary duty.

An ERISA fiduciary must discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

ERISA's "prudent man" standard is an objective one; it focuses on the process of the fiduciary's conduct preceding the challenged decision. *See, e.g.*, *Braden*, 588 F.3d at 595; *Katsoros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984). The standard asks whether the fiduciary, at the time he engaged in the challenged transaction, "employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 618 (2d Cir. 2006) (internal quotations omitted). "[T]he thoroughness of a fiduciary's investigation is measured not only by the actions it took in performing it, but by the facts that an adequate evaluation would have uncovered." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 436 (3d Cir. 1996); *see also In re: Citigroup ERISA Litig.*, 662 F.3d 128, 141 (2d Cir. 2011).

Where a "fiduciary was aware of a risk to the fund, he may be held liable for failing to investigate fully the means of protecting the fund from that risk." *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006).

**B.** **Allegations Regarding MSIM's Mismanagement of Plan Assets**

Reasonable inferences drawn from Plaintiffs' factual allegations render it at least plausible that the process by which MSIM selected and managed Plaintiffs' investments was tainted by failure of effort or competence. Because Plaintiffs have alleged sufficient facts to state a claim for breach of the ERISA duty of prudence, the District Court erred in dismissing their Prudence claim.

*1.* *Analysis*

The majority acknowledges that a complaint which contains "no factual allegations referring *directly* to MSIM's knowledge, methods, or investigations at the relevant times," Maj. Op. at 16, can survive a motion to dismiss so long as "the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged that the process was flawed.'" Maj. Op. at 17 (quoting *Braden*, 588 F.3d at 596). While the majority rejects the significance of Plaintiffs' alleged "warning signs," I would find that, when taken together, these allegations support the reasonable inference that MSIM's choices failed to meet ERISA's requirements. *See Braden*, 588 F.3d at 594 ("the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible.") (citing *Vila v. Inter-Am. Inv. Corp.*, 570 F.3d 274, 285 (D.C. Cir. 2009).

According to Plaintiffs, MSIM's mandate as the Plan's fixed-income investment manager was to manage the Portfolio with a focus on preservation of principal, with an emphasis on long-term growth. The written investment guidelines further designated Citigroup BIG as the

applicable investment benchmark; this allegedly "signaled to MSIM that, as an ERISA fiduciary, it was required to execute a low-risk, conservative investment strategy." Am. Compl. ¶ 21.

MSIM allegedly "abandoned this conservative investment profile to speculate in high-risk, mortgage-backed investments," *id.* ¶ 28, by making "high-risk investments . . . at precisely the time when defaults of subprime mortgages were skyrocketing and numerous subprime lenders were facing insolvency." *Id.* ¶ 29. Moreover, Plaintiffs allege that MSIM "failed to monitor the Plan's investments to protect the Plan from economic harm." *Id.* ¶ 61. According to Plaintiffs, "warning signs" appeared throughout 2007 and 2008, which signaled that the non-agency RMBS securities "were not appropriate for the fixed-income portfolio." *Id.* ¶ 35. For example, in 2007, analysts predicted that Morgan Stanley – MSIM's parent company – would write down $6 billion on the value of similar mortgage securities. In addition, MSIM invested Plan assets in subprime mortgage securities issued by, *inter alia*, IndyMac, Bear Stearns, and Countrywide. Reports filed by these entities in 2007 reflected (1) the rapid increase in delinquencies and non-performing home loans, *id.* at ¶ 38; (2) rising defaults "across all mortgage categories," *id.* at ¶ 41; (3) the fact that investments backed by risky mortgages had left two of Bear Stearns's hedge funds "virtually worthless," *id.* at ¶ 40; and (4) predictions that "before it turns around," the housing downturn would be "the longest and deepest since the Great Depression." *Id.* at ¶ 38.

In light of these warning signs, MSIM allegedly "knew or should have known" that exposing the Portfolio to such high-risk mortgage securities was imprudent. *Id.* at ¶ 34. Yet, Plaintiffs allege, MSIM continued to maintain the Portfolio's allocation of these risky investments from the fourth quarter of 2007 through 2008. As a result, the Portfolio "significant[ly] underperform[ed] relative to the Citigroup BIG benchmark": in the fourth quarter

of 2007, the Portfolio ended the quarter up 0.8%, whereas the Citigroup BIG ended the quarter up 5.7%; for 2008, the Portfolio was down 12%, while the Citigroup BIG was up 7%. *Id.* at ¶ 26.

While Plaintiffs' Amended Complaint does not specifically detail the processes by which MSIM allegedly mismanaged the Plan, *see, e.g.*, Am. Compl. ¶ 33 ("Had MSIM managed the fixed-income portfolio appropriately and according to its stated objective and risk level, the losses incurred by the Plan would not have occurred."), it is nonetheless reasonable to infer from what is alleged "that [MSIM's] process was flawed." *Braden*, 588 F.3d at 596. Plaintiffs allege that MSIM acted imprudently by maintaining investments in high-risk mortgage securities, at a time when MSIM knew or should have known that the market for such securities was collapsing. Moreover, Plaintiffs allege contemporaneous "warning signs" and do not rely on "the vantage point of hindsight." *In re Citigroup*, 662 F.3d at 140 (internal quotation marks omitted). Accepting these facts as true, and drawing all reasonable inferences in the light most favorable to the Plaintiffs – as we must on a motion to dismiss – these allegations give rise to a reasonable inference that "the process by which [MSIM] selected and managed the [investments] in the [Portfolio] [was] tainted by failure of effort [or] competence," *Braden*, 588 F.3d at 596. Whether or not they would ultimately prevail on their claim, Plaintiffs have – at a minimum – stated allegations which, when read in their favor, make MSIM's breach of its duty of prudence more than a "mere possibility."

### 2. *MSIM's Arguments Are Without Merit*

MSIM's attempt to portray each of Plaintiffs' allegations as insufficient is unpersuasive. [2]

Contrary to the analysis MSIM invites us to undertake, it is well-settled that a complaint must be

---

[2] MSIM begins by arguing that "the [Amended Complaint] contains no allegations that MSIM's investment processes were deficient." Appellee's Br. at 18. As

read "as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594 (citing *Vila*, 570 F.3d at 285); *see also id.* at 598 (stating that courts must undertake a "careful and holistic evaluation of an ERISA complaint's factual allegations before concluding that they do not support a plausible inference that the plaintiff is entitled to relief"). In any event, MSIM's arguments are without merit at the pleading stage.

First, MSIM contends that it is "irrelevant" whether, as Plaintiffs claim, the issuers of the mortgage securities in which MSIM invested "lost money" during the relevant time period. Appellee's Br. at 20-21. According to MSIM, this is so because "the default risk of a mortgage-backed security depends not on the financials of the issuer, but on the characteristics of the underlying *mortgages*." Appellee's Br. at 20. Whether MSIM's contention is correct is a factual question ill-suited for resolution at the pleading stage. In any event, where – as Plaintiffs allege – issuers of mortgage-backed securities announce massive losses due to defaults on the loans underlying such securities, it is at least plausible that such losses may say something about the overall risk of those types of securities.

Second, MSIM discounts Plaintiffs' allegation that Morgan Stanley – MSIM's parent company – was predicted by analysts to write down $6 billion worth of mortgage-backed securities similar to those in the Portfolio. MSIM faults Plaintiffs for failing to allege that MSIM "had knowledge of the predicted write-down or its bases, or that MSIM had any involvement with Morgan Stanley's decision to invest in the relevant securities." Appellee's Br. at 21. As a preliminary matter, whether MSIM in fact knew of its parent's predicted write-down is "inside information" Plaintiffs likely have no way of knowing "unless and until discovery commences,"

discussed, however, drawing reasonable inferences in Plaintiffs' favor renders plausible the claim that MSIM's process was tainted.

*Braden*, 588 F.3d at 598. In any event, and contrary to MSIM's argument, Plaintiffs do allege that Morgan Stanley's predicted write-down, together with other red flags, constituted "warning signs" of which MSIM "knew or should have known." Am. Compl. ¶¶ 34-35.

Third, MSIM argues that, although Plaintiffs allege that Standard & Poor's downgraded the credit ratings on $7 billion worth of Alt-A mortgage securities in December 2007, Plaintiffs fail to allege "that any securities *held by the* [*Portfolio*] were downgraded." Appellee's Br. at 22. MSIM cites no authority requiring ERISA plaintiffs to plead such evidence – and do so with such particularity – in order to survive a motion to dismiss. Plaintiffs have alleged facts which, if true, demonstrate the publicly-known volatility of the mortgage securities market. In light of Standard & Poor's $7 billion downgrade, it is at least plausible that a reasonable fiduciary would have reevaluated its decision to invest in that sector. *See, e.g.*, *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 734 (7th Cir. 2006) ("A [fiduciary] who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent.").

Similarly, MSIM cites to several district court decisions – many of which do not arise in the ERISA context – for the proposition that industry-wide troubles are insufficient to demonstrate MSIM knew or should have known of the risk associated with the investments at issue. As discussed in part C, *infra*, "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Braden*, 588 F.3d at 598. Plaintiffs have nonetheless made the common sense allegations that MSIM knew or should have known of the mortgage crisis by virtue of its role as investment manager and its experience in the marketplace. According to Plaintiffs, analysts predicted in 2007 that *MSIM's parent company* would write down *$6 billion* on the value of mortgage securities, Am. Compl. ¶ 37; several issuers of mortgage-backed securities *selected by MSIM* released troubling

announcements regarding mortgage-backed securities throughout 2007, *id.* ¶¶ 36-41; and in December 2007, Standard & Poor's reduced its ratings on about *$7 billion* of Alt-A mortgage securities as a result of a sustained surge in mortgage delinquencies. *Id.* ¶ 42. If true, such allegations render it plausible that MSIM knew or should have known of the impending crisis at the relevant time, and questioned whether the Plan's investments were still sound.

MSIM's arguments, if correct, suggest that it might well have a compelling defense to offer during the later stages of this litigation. They do not, however, alter the conclusion that Plaintiffs have adequately stated a claim for breach of the duty of prudence imposed by ERISA. To the extent that the majority takes up MSIM's invitation to assess the strength of Plaintiffs' allegations, such analysis is premature at this juncture.

### C. The Majority's New Pleading Requirement

In evaluating whether Plaintiffs sufficiently allege that MSIM acted imprudently, the District Court and the majority purport to merely assess whether the Amended Complaint states a plausible claim of imprudence regarding the process by which MSIM made the challenged investment decisions. But in doing so, both impose, *sub rosa*, a novel heightened pleading requirement.

The majority holds that "a claim for a breach of fiduciary duty under ERISA may survive a motion to dismiss – even absent any well-pleaded factual allegations relating directly to the methods employed – if the complaint 'alleges facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident.'" Maj. Op. at 17 (quoting *In re Citigroup*, 662 F.3d at 141). But the majority goes on to say that where a plaintiff relies on inferences from circumstantial allegations, "this standard generally requires the plaintiff" to allege facts showing "that a prudent fiduciary in like

-11-

circumstances would have acted differently." Maj. Op. at 20, 32. The majority thus announces a new and unjustified hurdle which ERISA plaintiffs must surmount in order to vindicate their statutory rights. It finds that Plaintiffs are unable to meet this standard because they have inadequately tied the alleged "warning signs" to specific securities held in the Portfolio, Maj. Op. at 21-24, and failed to suggest why MSIM should have sold those investments "at whatever unspecified prices existed during the unspecified period in which it was imprudent to maintain those unspecified investments." Maj. Op. at 21.

The majority's heightened pleading requirement finds no support in the only guideposts that matter at the pleading stage: Rule 8 and the standards articulated by the Supreme Court in *Twombly* and *Iqbal*. Rule 8 merely requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). I fail to see how the "short and plain statement" standard requires plaintiffs to outline in their complaints a more prudent course of action that the fiduciary should have taken.

Instead, Rule 8 permits a plaintiff to pursue a claim based on allegations which only indirectly show plausibly unlawful behavior, so long as the facts pleaded give the defendant fair notice of the claim, and allow the court to draw the reasonable inference that the plaintiff is entitled to relief. *Braden*, 588 F.3d at 595 (citing *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678). To withstand dismissal, then, it is sufficient if the allegations in the complaint, accepted as true, give rise to the reasonable inference that the fiduciary's process was flawed. *See id.* at 596. Where, as here, plaintiffs have identified the actions which were allegedly inappropriately risky, defendants are unquestionably on notice as to basis of the claim at issue. The rules of notice pleading require nothing more.

Moreover, the majority's newly articulated pleading requirement ignores the practical reality that plan participants' often lack access to relevant information and incentivizes fiduciaries to keep their actions concealed. While ERISA imposes certain disclosure requirements on plan administrators, there is no suggestion that these disclosures address *how* or *why* investment decisions were made. *See* Maj. Op. at 19. The consequence of the majority's holding is that the federal courts will often dismiss claims by ERISA plaintiffs who have not yet had an opportunity to employ appropriate discovery to develop their case. This is not what Congress intended when it enacted ERISA and subjected plan fiduciaries to the highest duties known to law. *See Donovan*, 680 F.2d at 272 n.8.

Furthermore, while ERISA plaintiffs may – as the majority suggests – generally have access to plan documents and reports that will provide them "the opportunity to find out how the fiduciary invested the plan's assets," Maj. Op. at 19, this does not mean that plaintiffs are somehow obligated to include such information in their complaints to survive a motion to dismiss. In other words, plaintiffs of all stripes may have access to mountains of evidence prior to discovery, but that does not change the fact that at the pleading stage all that is required is "a short and plain statement of the claim" showing an entitlement to relief. *See* Fed. R. Civ. P. 8(a)(2). The Supreme Court has said that a complaint need not contain "detailed factual allegations." *Iqbal*, 556 U.S. at 678. I am not alone in taking the Court at its word; we have similarly emphasized that *Twombly* and *Iqbal* do not "require the pleading of specific evidence or extra facts beyond what is needed to make [a] claim plausible." *Arista Records,* 604 F.3d at 120-21.

In light of the foregoing, I agree with the majority to the extent it holds that ERISA plaintiffs may state a claim for breach of the duty of prudence by alleging facts that "if proved,

-13-

would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." Maj. Op. at 17. But in my view, Plaintiffs have met this burden, and cannot be expected to further allege facts "showing that a prudent fiduciary in like circumstances would have acted differently." Maj. Op. at 20.

## CONCLUSION

For the reasons stated above, I would vacate the District Court's dismissal of Plaintiffs' Prudence Claim, and remand for further proceedings.

Because I agree that Plaintiffs' remaining claims were properly dismissed, I join the majority in affirming the dismissal of those claims.